**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Richard Earl WILLIAMS, Defendant-
Appellant.**

**No. 25395.**

United States Court of Appeals,
Ninth Circuit.

Dec. 29, 1970.

Michael P. Balaban (argued), Beverly Hills, Cal., for defendant-appellant.

J. Kent Steele (argued), Asst. U. S. Atty., Robert L. Meyer, David R. Nissen, Chief, Criminal Div., Los Angeles, Cal., for plaintiff-appellee.

Before BARNES, DUNIWAY and TRASK, Circuit Judges.

DUNIWAY, Circuit Judge:

Williams was found guilty by a jury under a one-count indictment charging him with bank robbery, 18 U.S.C. § 2113(a). We affirm. Williams argues that: (1) The evidence is insufficient to sustain the conviction; (2) the court erred in denying his pretrial request for an in-court lineup; (3) the court erred in admitting the testimony of two eye-witnesses, because that testimony was the product of illegal pretrial identification procedure; and (4) the court erred in not granting his pretrial motion to suppress that same testimony on the ground that it was the tainted fruit of an illegal search.

1. *Sufficiency of the evidence.*

On December 2, 1968, a man with shoulder-length hair and a full beard, wearing a bright shirt and a headband, entered the Citizens Commercial Bank in Pasadena, California. He approached a table facing the window of teller Hedy Renfro and remained there for three or four minutes while he wrote something. He then walked past teller Renfro's window toward the window of teller Judy Kelley. Teller Renfro had no line before her window, and asked him if she could help him. He looked at her, mumbled something that she could not clearly understand, and joined the line at teller Kelley's window. He stood in that line for something under two minutes. When he reached the window, he placed a note on the counter; the note read, "Hand me your money. I am not kidding. I have a bottle of nitroglycerin." He handed teller Kelley a paper sack, in which she placed approximately $308. He took the paper sack and left the bank.

At trial, tellers Kelley and Renfro testified to the foregoing facts, and both identified Williams as the robber. A third witness, one Miller, a neighbor of Williams, testified that before December 2, 1968, Williams had asked Miller if Miller had robbed the Citizens Commercial Bank. Miller said he had. Williams asked if it had been hard to do, and Miller told him it was easy.

While recognizing the hazards of untrustworthiness inherent in eyewitness identifications, see United States v. Wade, 1967, 388 U.S. 218, 228–229, 87 S. Ct. 1926, 18 L.Ed.2d 1149, we think that the jury could reasonably rely on the two tellers' in-court identifications of Williams as the robber. Teller Kelley said she was "ninety per cent sure that [Williams] is the person that robbed the bank." After approaching Williams during the trial and looking closely at him, teller Kelley said she was "very, very, very sure, but not a hundred per cent" sure that he was the robber. Teller Renfro also identified Williams, saying that he "looks very close to the bank robber. There are a few differences."

■ The fact that each teller voiced some reservations in her identification does not make these identifications legally insufficient. Each teller specified the particular characteristics shared by Williams and the robber that led her to conclude that the two were one and the same man. Teller Kelley said it was "[h]is physique, his face, his eyes," and "[t]he shape of his face." Teller Renfro testified that Williams had "the same height, built [sic], his eyes and his nose, the way he looks, you know, the way he's looking, exactly the same way." Each teller had ample opportunity to observe the robber at the time of the robbery. Their reservations reflected the fact that the robber had a beard and long hair while Williams, at trial, had short hair and was beardless, and also the fact that teller Kelley had been understandably nervous during the robbery. The reservations are compatible with a candid and conscientious approach toward their duties as witnesses in a felony trial, and the jury could have so found.

Williams' invocation of Alexander v. United States, 5 Cir., 1965, 354 F.2d 59, is unpersuasive. In that case, the identifications of the defendant were so uncertain as to be valueless.

The evidence was sufficient.

2. *Williams' request for an in-court lineup.*

Before the start of trial, defense counsel requested an "in-court lineup," which the trial judge denied. In cases such as this, where the question of guilt or innocence hangs entirely on the reliability and accuracy of an in-court identification, the identification procedure should be as lacking in inherent suggestiveness as possible. Yet that is often not the case. When asked to point to the robber, an identification witness—particularly if he has some familiarity with courtroom procedure—is quite likely to look immediately at the counsel table, where the defendant is conspicuously seated in relative isolation. Thus the usual physical setting of a trial may itself provide a suggestive setting for an eyewitness identification.

■ Because of such potential suggestiveness, some trial judges have granted defense requests to place the defendant in an in-court lineup, or to seat the defendant in the courtroom audience, before and during the testimony of the prosecution's identification witnesses. See, *e. g.,* Allen v. Rhay, 9 Cir., 1970, 431 F.2d 1160; United States v. Moss, 3 Cir., 1969, 410 F.2d 386, 387. Such arrangements are desirable efforts to ensure fair trials. But we cannot find any support for the assertion that a defendant has a right to such an arrangement whenever he requests it. Like the seating arrangements for prospective witnesses, Allen v. Rhay, *supra* (at 1164), the procedure for in-court eyewitness identification is left to the trial judge's discretion. Absent abuse of that discretion resulting in procedure "so unnecessarily suggestive and conducive to irreparable mistaken identification" as to

amount to a denial of due process of law, Stovall v. Denno, 1967, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199, we should not question the trial judge's ruling. Williams has failed to show any such abuse of the judge's discretion in this case.

3. *The legality of the pretrial identifications.*

Williams argues that the pretrial identification procedures used by the government have denied him both his Sixth Amendment right to counsel and his right to due process of law.

On April 1, 1970, a lineup was held in which Williams was viewed by tellers Kelley and Renfro. Williams was represented by counsel at the lineup. Each teller identified Williams as the person in the lineup who most resembled the robber. The two tellers were also shown, on various occasions between the time of Williams' being taken into custody and his trial, a group of photographs one of which was of Williams. Williams was the only person common to the lineup and the group of photographs.

a. *Right to counsel.*

■ Williams first argues that, on the authority of United States v. Wade, 1967, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, and Gilbert v. California, 1967, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178, he was entitled to have his counsel present when the prosecution, as part of its preparation for trial and after Williams was in custody, showed the photographs to the two eyewitnesses. We have rejected this contention in Allen v. Rhay, *supra* (at p. 1167), thus aligning ourselves with the Second, Fifth, Seventh and Tenth Circuits. See also United States v. Edwards, 9 Cir., 1970, 433 F.2d 357; United States v. Goetluck, 9 Cir., 1970, 433 F.2d 971; United States v. Roustio, 9 Cir., 1970, 435 F.2d 923. The contrary decision of the Third Circuit in United States v. Zeiler, 3 Cir., 1970, 427 F.2d

1305, does not persuade us to change our views.

b. *Due process of law.*

Williams contends that the lineup, taken in conjunction with the photographic identification, violated his right to due process of law. He bases his contention upon the fact that only Williams appeared as a subject in both the lineup and the photographic identification.

■ ■ We are required to set aside the conviction only if the pretrial identification procedure, taken as a whole, "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377 at 384, 88 S.Ct. 967 at 971, 19 L.Ed.2d 1247. Accord, Stovall v. Denno, 1967, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199; Allen v. Rhay, *supra*; Davis v. United States, 9 Cir., 1970, 425 F.2d 673, 674; Borchert v. United States, 9 Cir., 1968, 405 F.2d 735, 737. In the application of this test, "each case must be considered on its own facts." Simmons v. United States, *supra*, 390 U.S. at 384, 88 S.Ct. at 971. Here we find no basis for concluding that the lineup and the photographic spread were conducive to "irreparable misidentification." It is true that teller Renfro had been shown the photographic spread a second time the morning before trial. She stated, however, that she could have identified Williams in court as the robber without the benefit of having seen the photographs; we see no reason to disbelieve her statement. It suffices, therefore, to repeat what we said in *Davis, supra*, 425 F.2d at 674:

"While we do not condone the practice, followed in this case, of attempting to influence a witness's recollection by displaying to her a photograph of appellant immediately prior to testifying, we hold that the admission of the identification testimony on the record before us, did not, in any way, affect the substantial rights of the appellant."

*4. The identifications as the tainted fruit of an illegal search.*

Williams contends that the eyewitness identifications should have been excluded from the trial because they were the fruit of an illegal search and arrest by the police.

█ The relevant facts are taken from a stipulation made for the purposes of a hearing on Williams' motion to suppress. On January 2, 1970, officers of the Pasadena Police Department entered the apartment where Williams was living. They arrested several persons, Williams among them, on charges unrelated to the bank robbery. At the time, Williams was not even suspected of the robbery. After searching the apartment, the officers went next door to see whether Mrs. Lopez, a neighbor, could care for Williams' dog and cat. She told the officers that they should investigate the possibility that Williams was the bank robber. The officers asked her why and she replied, "I was in his apartment the morning of that robbery when he wrote a note using the word 'nitroglycerin' in it after asking me how to spell it." Following her tip, the officers returned to Williams' apartment and conducted a search for items that might connect Williams with the robbery. Several were found.

Williams moved that all items seized during these two searches be held inadmissible at trial, and this motion was granted. Williams claims that Mrs. Lopez' statement was equally the fruit of an admittedly unlawful search, that without her statement the police would have had no reason to connect Williams with the robbery, the lineup and the photographic identification would not have occurred, and consequently the defense motion to exclude all the identification evidence as the tainted fruit of an illegal search should have been granted.

Both Williams and the government agree that the question presented is to be answered by applying the test of Wong Sun v. United States, 1963, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441. The government argues that the application of *Wong Sun* to testimonial eyewitness evidence differs from its application to tangible, inanimate evidence, insofar as the determination of the extent of the derivative taint is concerned. *Cf.* Gilbert v. United States, 9 Cir., 1966, 366 F.2d 923, 945; Smith v. United States, 1963, 117 U.S.App.D.C. 1, 324 F.2d 879, 881–882. We see no need to reach this question, however, for we hold that no primary taint attached to Mrs. Lopez' statement under *Wong Sun*.

The *Wong Sun* test is contained in the following language:

"We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" 371 U.S. at 487–488, 83 S.Ct. at 417.

The "primary illegality" in this case was the arrest of Williams and the accompanying search of his apartment. Clearly, Mrs. Lopez' statement to the officers would not have been made—at least not then—but for that arrest. But we find it impossible to conclude that her statement was the result of the officers' "exploitation" of that arrest. The officers approached Mrs. Lopez solely for the purpose of inquiring whether she could care for Williams' cat and dog. No attempt was made to gain any information from Mrs. Lopez regarding any activities of Williams; her statement was gratuitously volunteered; unlike the statements in *Wong Sun*, it was "sufficiently an act of free will to purge the primary taint of the unlawful [arrest and] invasion." 371 U.S. at 486, 83 S.Ct. at 416. There is no reason to believe that the officers had any investigative intent when they sought out Mrs.

Lopez. The arrest and search had been completed; the officers already had all the evidence they needed to arrest and convict Williams on the charges in connection with which they originally sought him out, assuming the evidence had been admissible.

We are aware that very little time elapsed between the illegal arrest and the conversation with Mrs. Lopez. We do not, under the facts of this case, regard duration of time as determinative of the existence of a taint. In this case, the "connection [has] become so attenuated as to dissipate the taint," Nardone v. United States, 1939, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307, not because of the passage of time but because the officers' approach to Mrs. Lopez had only a coincidental connection with the immediately preceding arrest. The situation is similar to a case in which the tip came from a person who, in a later stage of the proceedings against Williams on the original state charges, had unexpectedly and gratuitously volunteered information about the bank robbery that the police had no reason to believe he possessed. Once presented with such information, the police were entitled to use it.

Affirmed.