David MURPHY, Jr., Appellant (Defendant Below),

v.

STATE of Indiana, Appellee (Plaintiff Below).

No. 4–1083A341.

Court of Appeals of Indiana, Fourth District.

March 5, 1985.
Rehearing Denied April 17, 1985.

Pamela P. Kosenka, Stults, Custer, Kutansky & McClean, Gary, for appellant.

Linley E. Pearson, Atty. Gen., Jay Rodia, Deputy Atty. Gen., Indianapolis, for appellee.

MILLER, Presiding Judge.

A Lake County jury convicted David Murphy, Jr. of armed robbery, class B felony, in the theft of an automobile from Patricia Overmeyer, and the trial court sentenced him to six years in prison. Murphy bases the instant appeal on alleged error in his identification by eyewitnesses, on the failure of the trial court to grant a continuance, on a violation of the court's separation order, and on the insufficiency of the evidence. We are unable to find error in Murphy's contentions and affirm.

## ISSUES

1. Whether the trial court erred by permitting eyewitnesses to make in-court identifications of Murphy in light of their previously suppressed testimony with respect to a tainted pre-trial photographic identification of him;

2. Whether the trial court abused its discretion by denying Murphy's request to sit elsewhere in the courtroom than counsel table in order to test the eyewitnesses' in-court identification;

3. Whether the trial court abused its discretion when it denied Murphy's request, made the day of trial, for a continuance to obtain an out-of-state witness;

4. Whether the trial court abused its discretion by failing to ensure enforcement of its order for the separation of witnesses;

5. Whether there was substantial evidence of probative value by which the jury could conclude that Murphy was guilty of the crime of robbery beyond a reasonable doubt.

## FACTS

Just before dusk on July 24, 1980, sometime between 7:00 and 8:00 P.M., Overmeyer and her friend, Annette LaBarge, finished shopping at the Venture department store in Griffith, and proceeded to return to Overmeyer's car. Overmeyer owned a blue 1980 Pontiac Firebird and had parked it some distance from the store in order to avoid placing it near other cars so as to prevent it from being nicked and scratched. As the two women approached the vehicle, Overmeyer thought it odd that another car with two occupants had been parked next to hers in an isolated area. This other was set parallel to Overmeyer's on the driver's side, and as she reached her door, the driver engaged her in a conversation about her car, particularly complimenting it. Overmeyer unlocked her car and disengaged the alarm system, while continually glancing at the other driver. She got in her car and locked it, but before she had an opportunity to unlock the passenger door for LaBarge, she saw the other driver bring a gun up and point it in her direction. He ordered her out of the car while LaBarge began to walk around the rear of Overmeyer's vehicle from the passenger side, in order to help. The driver then pointed the gun at LaBarge. Overmeyer, in the meantime, had gotten out of her car and tossed the keys to him. He ordered the women to turn and walk away, and they practically ran back to the store. The whole incident lasted from fifteen to thirty seconds, and both women insisted that, because of the intensity of the situation, they both kept their eyes almost constantly on the robber and because of the sunlight and their as-

sailant's proximity, they both got a clear image of his features. (Overmeyer was only a couple feet away and faced the robber when she gave him the keys; La-Barge was separated only by the width of the car and watched him throughout most of the incident). Overmeyer duly reported the crime to the Griffith Police Department.

Nearly seven weeks later, on September 12, Officers Wade and McKinney of the Gary Police Department were working a parttime security detail at Lew Wallace High School in Gary when one Craig Matlock approached the officers and told them that Murphy would be arriving at the school in a stolen car. Matlock was evidently willing to turn over his friend because Murphy had stolen his girlfriend. Within 30 to 45 minutes, the officers spotted Murphy driving a blue Pontiac Firebird with Matlock riding as passenger. Matlock signalled the officers, and they activated the siren and flashing lights of their own vehicle and attempted to "curb" Murphy's car so they could run a check on its ownership. Instead, Murphy accelerated the Firebird and led the police in a high-speed (50 to 60 mph) chase through Gary. Eventually, the Firebird crashed into a fire hydrant, and Murphy attempted to escape on foot. He was pursued and captured with the help of an off-duty county officer. Officer McKinney verified that both the car and the license plate were stolen, the VIN of the wrecked Firebird matching that of Overmeyer's stolen vehicle. All the authorities could educe from Murphy was that the car belonged to someone named "Slick."

At trial, in May, 1983, both Overmeyer and LaBarge identified Murphy as the man who had threatened them with a gun then had stolen Overmeyer's car. In his defense, Murphy attempted to establish the alibi that he had spent most of the evening of July 24, 1980, with his mother and therefore could not have committed the instant offense. In addition, he produced witnesses who testified he always wore glasses, unlike the robber. The jury believed the state's case and found Murphy guilty of armed robbery.

## DECISION

### Identification Evidence

Prior to trial, Murphy moved to suppress all identification evidence to be elicited from eyewitnesses, Overmeyer and La-Barge, both from a pre-trial photographic array and from any possible in-court identification. At the hearing on the motion, Murphy presented a convincing argument that the September 12 photographic array displayed to Overmeyer and LaBarge was improperly conducted because of the dissimilarity of three of the five photographs from Murphy's picture and the fact that Murphy's mugshot clearly displayed his September 12 arrest date. So convincing was Murphy's argument that the trial court granted his motion to suppress with regard to this identification. The court, however, refused to suppress either witness's in-court identification, finding there were sufficient independent bases for Overmeyer's and LaBarge's testimony.

At that hearing LaBarge testified that on the evening in question it was sufficiently light out for her to see the robber clearly and that she had been only a few feet away during the entire incident, and she stated she had watched him throughout. Overmeyer had been much closer to the perpetrator, described as within "arm's reach," and estimated the incident lasted close to thirty seconds. She too constantly observed the man and got a particularly clear view of his features when she tossed him her car keys. When Overmeyer and La-Barge reported the crime to the Griffith Police, they described their assailant as "Medium height, male, Negro, close cropped Afro-hair style, eighteen (18), seventeen (17), eighteen (18) years old, allegedly wearing blue jeans and some type of a top ...." Record, p. 176. They also declared he had no facial hair. The women then assisted in producing an identi-kit portrait of the robber, which bore the following description: "MALE/NEGRO–LIGHT TO MEXICAN FEATHURS [sic] 18 yrs. 5'6" APPOX [sic]" Record, p. 198. On the

basis of this testimony the judge ruled against Murphy's motion to suppress and furthermore later overruled his objections to both witnesses' actual in-court identification. We believe he correctly ruled.

■ Our courts make a distinction between the admission of testimony concerning an improper pre-trial identification of a defendant and the admission of an in-court identification which is made without regard to the former. An in-court identification untainted by improper pre-trial procedures is, without question, admissible. Our inquiry in such situations is for the determination of whether an independent source exists for the in-court identification such that the taint of an earlier identification is of no moment. *Cooper v. State* (1977), 265 Ind. 700, 359 N.E.2d 532. We believe, as did the trial court, that such independent bases exist here.

■ As our law clearly allows, the state must establish an independent source for an in-court identification by demonstrating through clear and convincing evidence that the witness/es did have, at some time independent of any suggestive procedures, sufficient occasion to formulate an insular recognition of the defendant. *Johnson v. State* (1982), Ind., 432 N.E.2d 403. Our supreme court has declared that such scrutiny of a witness's independent recollection

"considers only the objective circumstances of each case. These consist of the witness' actual opportunity to observe the accused and such facts as would indicate whether or not the witness could have identified the suspect without the influence of the suggestive procedure."

*Cooper v. State, supra,* 265 Ind. at 703, 359 N.E.2d at 534. Such circumstances include:

1) "prior opportunity to observe the alleged criminal act,"
2) "the existence of any discrepancy between any pre-lineup description and the defendant's actual description,"
3) "any identification prior to lineup of another person,"
4) "the identification by picture of the defendant prior to the lineup,"
5) "failure to identify the defendant on a prior occasion,"
6) "the lapse of time between the alleged act and the lineup identification,"
7) "the length of time the witness was in the presence of the perpetrator,"
8) "the distance of the witness from him,"
9) "the lighting conditions at the time,"
10) "capacity for observation by the witness,"
11) "opportunity to observe particular characteristics of the criminal."

*Harris v. State* (1980), 273 Ind. 60, 62–63, 403 N.E.2d 327, 329; *Johnson v. State, supra,* 432 N.E.2d 403. Looking, as we must, to the evidence most favorable to the trial court and any uncontradicted evidence favorable to Murphy (*see Morgan v. State* (1980), 272 Ind. 504, 400 N.E.2d 111), we find Overmeyer and LaBarge had sufficient independent foundation to justify admitting their in-court identifications.

At the time of the incident, the evening of July 24, 1980, the weather was clear, and there remained sufficient sunlight to see Murphy's face distinctly. Both women observed their assailant almost continuously during the incident and stood no more than an "arm's reach" (Overmeyer) and a car's width (LaBarge) from him. The incident admittedly lasted only 15–30 seconds, but both women declared it seemed much longer and that the intensity of the situation left Murphy's image imprinted in their memories. Upon reporting the crime to the police, the women gave a clear and detailed description of the robber and were able to help compile an identi-kit portrait, which, in general terms, has features characteristic of Murphy's mugshot (although not an exact likeness by any means).

On Murphy's behalf, there was uncontradicted evidence that Murphy always wears glasses. But we must remember that

glasses are not an immutable characteristic that Murphy could not dispense with temporarily. He additionally attacks the description on the identi-kit portrait that the suspect had "light to Mexican" features when, as he points out, he has a medium to dark complexion with negroid features. What Murphy ignores is that the description also states the suspect was "Negro" and that it is not beyond experience to imagine one with "light to Mexican" features as being within light to medium complexion (as Murphy describes himself). In the presence of the foregoing, we are firmly convinced the trial court properly ruled that Overmeyer and LaBarge each had an independent source for their in-court identifications of Murphy.[1]

*Sitting at Counsel Table*

On the opening day of trial, Murphy moved to be allowed to sit elsewhere than at counsel table. His rationale for so making such a motion was to better test the eyewitnesses' in-court identification of him by not providing them with any advantage caused by the typical adversarial seating arrangements. The trial court denied his motion; we sustain this decision.

■ The implied underpinning of Murphy's request was to provide him with the opportunity to test the eyewitnesses' identification through an informal type of in-court lineup. Such has been allowed in some trial courts by allowing an accused to sit in the courtroom audience and to even participate in a formalized in-court lineup. *See United States v. Williams* (9th Cir. 1970), 436 F.2d 1166, *cert. denied* (1971), 402 U.S. 912, 91 S.Ct. 1392, 28 L.Ed.2d 654. However, a defendant has no inherent right to such a procedure and can attack the trial court's failure to provide one only

as an abuse of its discretion in that the defendant was otherwise identified under unnecessarily suggestive conditions conducive only to irreparable misidentification. *Id.; United States ex rel. Clark v. Fike* (7th Cir.1976), 538 F.2d 750, *cert. denied* (1977), 429 U.S. 1064, 97 S.Ct. 791, 50 L.Ed.2d 781; *see also Commonwealth v. Ceria* (1982), 13 Mass.App. 230, 431 N.E.2d 608. Under the circumstances, where we have already determined Overmeyer and LaBarge possessed independent bases for their in-court identifications, we are unable to find any abuse of discretion.

■ Murphy argues that, in the absence of such in-court procedures, the trial court should, at the very minimum, have delivered a cautionary instruction advising the jury of his request. He refers us to *Commonwealth v. Sexton* (1979), 485 Pa. 17, 400 A.2d 1289, in support of this proposition but fails to realize this case is inapplicable because it dwells upon *pretrial* procedures, not in-court procedures as requested here. Regardless, Murphy failed to tender an appropriate instruction and has waived the point. *See, e.g., McCraney v. State* (1983), Ind., 447 N.E.2d 589.[2] We find no error in the court's refusal to grant Murphy's request or its failure to deliver a relevant instruction.

*Continuance*

■ On the opening day of trial, Murphy also moved for a continuance because, he claimed, an essential witness was out of the state. The affidavit accompanying his motion reads:

"COMES NOW RICHARD L. MAYER, being first duly sworn upon his oath, and deposes and says the following:

---

1. Murphy also argues the trial court used an improper test for determining the two women had independent bases for their in-court identification. He claims Indiana has long confused the "independent source" test of Sixth Amendment right-to-counsel cases with the "reliability" test of all other tainted identification cases. We are not persuaded there is any but an artificial distinction and adhere to our courts' treatment of the issue in a uniform manner. *Compare Cooper v. State* (1977), 265 Ind. 700, 359 N.E.2d

532 (suggestive pretrial identification) *with Hopkins v. State* (1975), 163 Ind.App. 276, 323 N.E.2d 232 (identification without counsel).

2. It might be pertinent to note that our supreme court recently endorsed the discretionary practice of granting *pre-trial* lineups at the request of defendants as a form of discovery. *See Morris v. State* (1984), Ind., 471 N.E.2d 288.

1. That I am the attorney for the Defendant, David Murphy, Jr.

2. That the initial arrest of David Murphy, Jr., occurred in the City of Gary.

3. That the discovery I have obtained from the Prosecutor indicates that a Craig Matlock from Gary, Indiana, lead [sic] the police to arrest David Murphy, Jr., and that Craig Matlock, was actually in the presence of David Murphy, Jr., and in the vehicle which is the subject matter of this Class 'B' robbery at the time of David Murphy, Jr.'s arrest.

4. That Craig Matlock did live in Gary, Indiana, but from information I received from Deputy Prosecutor Garza, he now lives outside of the State of Indiana, and will be back in Indiana during the month of August, and there is a high probability that his testimony could be had at Trial in August.

5. I have also seen Craig Matlock personally, and I believe he looks extremely similar to the appearance of my client, David Murphy, Jr., and believe that if he testifies and is seen by the Jury, they may very well have the same doubts concerning identification that I now have.

6. I was only recently informed the day after I had subpoenaed Craig Matlock for Trial as the defense witness, that he would not be available, and this information came to me from Deputy Prosecutor Garza on May 4, 1983.

7. The absence of Craig Matlock has not been procurred [sic] by my act or connivance nor by David Murphy, Jr.

8. I would expect that Craig Matlock would implicate himself by his testimony, and even if he does not, by his being in the car, and by his physical resemblance to David Murphy, Jr., it will lend credence to the fact that David Murphy, Jr., was not the person who committed the robbery in question...."

Record, p. 49–50. We review any challenge to a trial court's denial of a continuance with regard to whether the court abused its discretion. *See, e.g., Dillon v. State* (1983), Ind., 448 N.E.2d 21; *Taylor v. State* (1980), Ind.App., 409 N.E.2d 1246. In such review, the defendant must demonstrate he was prejudiced by the court's ruling and that he was not at fault. *Jacobs v. State* (1982), Ind.App., 436 N.E.2d 1176. Murphy has not shown us such abuse of discretion.

The procedure for gaining a continuance due to the absence of a witness is governed by statute:

"(a) A motion by a defendant to postpone a trial because of the absence of evidence may be made only on affidavit showing:

(1) that the evidence is material;

(2) *that due diligence has been used to obtain the evidence;* and

(3) the location of the evidence.

(b) If a defendant's motion to postpone is because of the absence of a witness, the affidavit required under subsection (a) must:

(1) show the name and address of the witness, if known;

(2) indicate the probability of procuring the witness's testimony within a reasonable time;

(3) show that the absence of the witness has not been procured by the act of the defendant;

(4) state the facts to which the defendant believes the witness will testify, and include a statement that the defendant believes these facts to be true; and

(5) state that the defendant is unable to prove the facts specified in accordance with subdivision (4) through the use of any other witness whose testimony can be as readily procured.

(c) The trial may not be postponed if:

(1) after a motion by the defendant to postpone because of the absence of a witness, the prosecuting attorney admits that the absent witness would testify to the facts as alleged by the defendant in his affidavit in accordance with subsection (b)(4); or

(2) after a motion by the defendant to postpone because of the absence of written or documentary evidence, the prosecuting attorney admits that the

written or documentary evidence exists.

(d) *A defendant must file an affidavit for a continuance not later than five (5) days before the date set for trial. If a defendant fails to file an affidavit by this time, then he must establish, to the satisfaction of the court, that he is not at fault for failing to file the affidavit at an earlier date.*

(e) If a motion for continuance is based on the illness of the defendant or of a witness, it must be accompanied by:

(1) oral testimony, given in open court; or

(2) a written statement; of a physician or hospital official having the care or custody of the defendant or witness, presenting the nature of the illness and the probable during of the person's incapacity to attend trial. Such a written statement must be sworn to by the person making the statement before an officer authorized to administer an oath. The court may appoint a physician to examine the defendant or witness and report to the court on the nature of the person's illness and of his incapacity to attend trial. The court shall by order provide for compensation for such a physician."

IND.CODE 35–36–7–1 (emphasis added); *see also* Ind. Rules of Procedure, Trial Rule 53.5. The italicized portions of the statute above are the areas where Murphy's motion is quite obviously deficient.

██ Murphy did not file his motion until the first day of trial, May 9. The statute requires such motions be filed no later than five days before trial unless he can show he was not at fault. The affidavit itself reveals Murphy knew at least five days before trial, on May 4, that Matlock was out of state. In the absence of any justification for the delay, the motion obviously does not comply with the statute. The court properly denied the motion. *See, e.g., Dillon v. State, supra,* 448 N.E.2d 21; *Lee v. State* (1982), Ind., 439 N.E.2d 603; *see generally Shropshire v. State* (1972), 258 Ind. 70, 279 N.E.2d 219. Even granting to

Murphy the materiality of Matlock's physical resemblance as a source for attacking the eyewitnesses' credibility (*see Watkins v. State* (1983), Ind., 446 N.E.2d 949), we still must find the trial court did not err because Murphy has failed to show prejudice in its denial of his motion.

Nowhere in his affidavit does Murphy's counsel allege that the failure to procure Matlock's attendance was not because of any lack of *due diligence,* the second statutory factor with which Murphy failed to comply. In fact, the record reveals trial was first set on October 4, 1982, for two months later, on December 13. Because of a pretrial conference and the hearing on the motion to suppress, the trial was put off to February 7, 1983 (Record, p. 40) and then, on March 3, 1983, was finally set for May 9. In addition, Murphy had to have been aware of Matlock's role in the course of events because his counsel was present at the taking of Matlock's deposition on September 1, 1981, a year and a half before trial. However, Murphy fails to explain why he did not subpoena Matlock any earlier or why we should believe that he could not have discovered his out-of-state status any sooner than five days before trial. Under almost the exact same circumstances, our supreme court found no error in denying a continuance:

"The trial date of April 10, 1961, was set by the court on February 3, 1961. Appellant did nothing to locate Young until April 5, 1961, when he alleged he told his attorney that Young was in jail. In his verified motion he stated that he made due diligence to obtain said evidence at the earliest possible time after learning of the incarceration of said witness * * *"

'The specific facts constituting diligence on the part of the defendant and his attorney must be fully set out. If anything is left to inference and conjecture the inferences indulged will be against the party who could have shown the real facts and failed to do so. The time when the absence of the witness was first discovered, together with the

steps taken to discover his whereabouts, when any information was obtained and what use was made of it, the time when defendant or his counsel learned where the witness was, the fact that a subpoena was issued for defendant, and when it was issued or why it was not issued, or any facts constituting an excuse for failing to produce the witness or to take his deposition. A mere statement of the applicant's own conclusions as to the diligence used and his inability to find the witness is not sufficient; and the statements showing diligence and tending to excuse defendant for whatever he failed to do toward finding an absent witness, must exclude all reasonable inferences of a lack of diligence.' Ewbank's Indiana Criminal Law, Symmes Ed., Vol. 1, Ch. 15, § 289, pp. 167, 168, and cases cited therein.

It is manifest that the affidavit is deficient upon the question of diligence, and therefore the court committed no error in overruling the motion."

*Tait v. State* (1963), 244 Ind. 35, 47, 188 N.E.2d 537, 543–44; *see also Tyner v. State* (1975), 166 Ind.App. 45, 333 N.E.2d 857. It is obvious that Murphy's affidavit did not qualify under the required "due diligence" element. Thus, we can find no prejudice with no abuse of trial court discretion.[3] *See generally Walker v. State* (1984), Ind., 471 N.E.2d 1089.

### Separation of Witnesses

In Murphy's motion to correct error, his mother, Myrtle Murphy, swore to an affidavit allegedly showing that Overmeyer and a Griffith police officer had violated the trial court's order for separation of witnesses:

"Comes now the undersigned, and having been duly sworn, deposes and says:

1) That she was present in the hall outside Lake Superior Criminal Court Room Three on May 11, 1983.

2) That sometime after 11:00 A.M., and before noon, on said date, Detective Kenneth Mowery of the Griffith Police Department came out of the courtroom apparently having completed his testimony in the trial of David Murphy, Jr.

3) That he went directly to the place where complaining witness, Patricia Sue Overmeyer, sat awaiting her call to the stand.

4) That they subsequently engaged in conversation for a period of three to four minutes.

5) That the deponent moved to a position closer to the two witnesses so that she might ascertain the contents of their conversation.

6) That as the deponent approached, she heard Detective Mowery say, 'I just hope you remember what we told ...' conversation then trailed off.

7) That thereupon, the deponent's presence was noticed and Detective Mowery made the concluding remark, 'I just hope you remember what has been said.'

8) That deponent did not have an opportunity to discuss this information with the defendant until after the jury had been charged.

Further, deponent sayeth not.

/s/ MYRTLE MURPHY"

Record, p. 18. The trial court evidently found no merit to Murphy's allegations of witnesses' improper conduct because it denied his motion to correct error. We too find no error.

 Murphy is quite correct in his assertion that when a witness violates a court's separation order for preventing witnesses from being exposed to other testimony in the case, the court is well within

---

**3.** Subsequent events at trial also supported the action of the trial court on the continuance issue. When Murphy attempted to introduce Matlock's deposition into evidence, the court denied its admission because Murphy could not establish Matlock was unavailable. As a matter of fact, counsel stated that Matlock might even be back in the Gary area. Regardless, counsel averred in his affidavit Matlock would return to the state by August, by which time Murphy could have procured his sworn statement and perhaps a photograph to affix to a motion to correct error within sixty days of his June 17th sentencing. This also supports our finding that Murphy failed to establish prejudice. *See Jacobs v. State* (1982), Ind.App., 436 N.E.2d 1176.

its discretion to strike that witness's testimony. *See, e.g., Cua v. Ramos* (1982), Ind., 433 N.E.2d 745 (civil action); *Buchanan v. State* (1975), 263 Ind. 360, 332 N.E.2d 213; *Butler v. State* (1951), 229 Ind. 241, 97 N.E.2d 492. However, Mrs. Murphy's affidavit indicates that Overmeyer and the police officer merely conversed. There are absolutely no revelations here between the witnesses about the case, and thus, there was no violation of the order on the record. We fail to see how we can predicate a reversal where Murphy has not presented us with any impropriety and find no error in the trial court's failure to grant a new trial thereon. *See Brown v. State* (1983), Ind., 445 N.E.2d 82 ("A party who claims error bears the burden of producing a record which bears out his claim." *Id.* at 83); *Smith v. State* (1977), 267 Ind. 167, 368 N.E.2d 1154.[4]

### Sufficiency of the Evidence

██ When we are called upon to review a jury's verdict, our standard is clear:

"[T]his [c]ourt will neither reweigh the evidence nor determine the credibility of the witnesses and will consider only that evidence most favorable to the State with all reasonable inferences drawn therefrom. We will not disturb a verdict if we find substantial evidence of probative value to support it."

*Ballard v. State* (1984), Ind., 464 N.E.2d 328, 330. Accoutred with this charge, we must compare the facts we recited above with the offense of armed robbery, class B, for which Murphy was convicted:

"A person who knowingly or intentionally takes property from another person or from the presence of another person: (1) by using or threatening the use of force on any person; or (2) by putting any person in fear; commits robbery, a Class C felony. However, *the offense is a Class B felony if it is committed while armed with a deadly weapon,* and a Class A felony if it

results in either bodily injury or serious bodily injury to any other person."

IND.CODE 35-42-5-1 (Supp.1980). We find the state quite obviously presented a sufficient case.

The facts presented by the state indicated that 1) Murphy stole (an unlawful taking) 2) from Overmeyer (from another person) 3) her Pontiac Firebird (any article of value) 4) by putting her in fear (Record p. 314) 5) while armed with a deadly weapon, a gun. Robbery, Class B, was established. *See Manley v. State* (1980), Ind. App., 410 N.E.2d 1338. Murphy attempts to controvert the verdict by arguing Overmeyer and LaBarge identified the wrong person and that instead he was home with his mother during the robbery. He also insists the two women's inexperience with guns precludes them from being able to recognize one when they see one. As we stated before, we cannot adjudge the credibility of the witnesses at trial, and if the jury chose to believe the state's witnesses rather than Murphy's, we are in no position to gainsay such conclusion. In addition, Murphy's assertion that the auto belonged to someone named "Slick" is hardly credible when such label can be used in this society as a general signal of either disapproval or approbation. We do not find any inherent problems with upholding a jury verdict that finds unbelievable a story that a fellow of no greater acquaintance than to be known as "Slick" would loan Murphy a relatively new and expensive sports car.

██ We must also remind Murphy that additional facts, beyond those of the robbery itself, support the verdict. First of all, the Firebird was undisputedly discovered in Murphy's possession and control. This may be evidence of guilt. *Vaughn v. State* (1939), 215 Ind. 142, 19 N.E.2d 239. Secondly, evidence of Murphy's flight from the police officers during the auto chase in order to avoid arrest is circumstantial evidence of guilt. *See, e.g., Short v. State* (1982), Ind., 443 N.E.2d 298;

---

4. Murphy also contends the trial court erred in failing to give an instruction to the jury on this issue. Considering the fact that the issue did

not arise until his motion to correct error, we believe the delivery of such instruction was impossible.

**52**

*Manley v. State, supra,* 410 N.E.2d 1338; *Boles v. State* (1975), 163 Ind.App. 196, 322 N.E.2d 722; *Marshall v. State* (1974), 162 Ind.App. 392, 320 N.E.2d 830.[5] The evidence underlying the jury verdict was substantial and we

Affirm in all respects.

CONOVER and YOUNG, JJ., concur.

---

5. In *Marshall v. State* (1974), 162 Ind.App. 392, 320 N.E.2d 830, we find a case almost on point:

"[The] evidence included testimony showing that the automobile driven by appellant was pursued by Officer Luker for approximately ten or eleven blocks; that during the pursuit the officer utilized a flashing red light and siren; and that appellant's stop was not voluntary in that he failed to negotiate a turn and 'slid into a curb.' Contrary to what defendant sets forth as his subjective thought processes in regard to flight, the facts and inferences therefrom reasonably lead to the conclusion that defendant was attempting to effectuate an escape at the time of apprehension." *Id.* at 396, 320 N.E.2d at 832.