Filed 7/29/16  P. v. Smith CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>LAMOUR SMITH,<br><br>     Defendant and Appellant. | A143703<br><br>(Alameda County<br>Super. Ct. No. C173693) |

Lamour Smith was convicted of three counts of second degree robbery, each with a firearm use allegation, and one count of assault with a semiautomatic firearm.  He contends the court abused its discretion when it denied his motion to compel a pretrial lineup pursuant to *Evans v. Superior Court* (1974) 11 Cal.3d 617 (*Evans*).  Alternatively, he argues his attorney's failure to request a lineup in a timely fashion violated his constitutional right to effective representation.  Smith also maintains the denial of his request for one of the witnesses to describe his assailant before he was  permitted to identify him in court was an abuse of discretion and a denial of due process of law.  Smith's assertions are meritless.  We affirm the judgment.

## BACKGROUND

### *Moses Jacko*

On the night of October 22, 2013, Moses Jacko drove to 2235 East 23rd Street in Oakland to deliver a pizza.   A prior customer had paid him with a $50 bill, which was unusual, and he was carrying about $250 in cash from previous deliveries.

1

Jacko could not find the address he had been given, so he called the phone number on the order— (510) 467-6933.   A woman, "Lola," answered, told him the address he had was incorrect and said "No, you have to come further."   She said, " 'We are a block away from where you are at. I see your car. Should I keep coming?' "

Jacko drove further.   As he turned a corner he saw an African American woman in her mid-20's wearing black and white leggings and a pink knit beanie hat.   He stopped and got out of his car and handed the woman her pizza.   Then, as he reached to get her soda, a man approached and pulled a gun that Jacko later tentatively identified as a semiautomatic.   The robber was a "black male, somewhere around mid-20's.   I'm five-eight, so he had to be at least five-ten.   He was taller than me; slender build; he had a red hat on" and his hair was "to about the jaw area."   The area was not well lit, but it was not extremely dark.   Jacko got a "pretty good" look at Smith.   At trial, Jacko identified Smith as the robber and was "[o]ne hundred percent" sure of his identification.

Smith took Jacko's cash, wallet and delivery receipts.   The woman took his black Nokia phone.   After the robbery the couple walked down Inyo Avenue toward a dead end.

Jacko flagged down police officer Nicholas Petersen and reported the robbery.   He described the male robber as approximately five feet nine inches tall with a thin build and full lips, wearing a red baseball hat.   Officer Petersen radioed the information to other officers.

Officer Ira Anderson was in his patrol car on 23rd Avenue between East 22nd and East 23rd Street when a couple walking by caught his attention. The woman was wearing black and white pants and a bright pink knit cap.   Her companion had on a hooded gray sweatshirt and a red hat.   He was holding a black cell phone to his ear but not talking.   A few moments later Andersen heard Officer Petersen's broadcast about the robbery.   He responded and asked Petersen if the woman was wearing a pink hat.   When Petersen confirmed that she was, Anderson stopped and detained the couple.   Smith had a black cell phone in his hand and one of the pair had a white plastic bag containing a two-liter bottle of soda.

Officer Petersen drove Jacko to Anderson's location for a field show-up. The officer told Jacko that police had detained two people who might or might not be the robbers. Jacko recognized Smith as the male robber by Smith's red hat, facial hair, distinctive walk and saggy pants. The female detainee was the woman who robbed him.

Officer Petersen blocked his own phone number by pressing star 67 and dialed the phone number that "Lola" had used to place her order. The black cell phone Smith was carrying when he was stopped vibrated and displayed a call from a blocked number.

No weapons or pizzas were found. Smith had $240 in his pocket, comprised of one $50 bill, six $20 bills, twelve $5 bills and ten singles. The denominations "[p]retty much" matched the denominations taken from Jacko.

*Felipe Soares de Oliveria*

On October 15, 2013, Felipe Soares de Oliveria attempted to deliver a pizza to a woman named Lola at 2235 East 23rd Street in Oakland. When he was unable to find the house he called the phone number on the order, (510) 467-6933. A woman answered, said she could see Mr. de Oliveria's lights, and waved at him from down the street. De Oliveria drove toward her to the intersection of 23rd Street and Inyo Avenue. When he stopped his car he saw Lola with a man later identified as Smith.

De Oliveria got out of his car and gave Lola the pizza. She waited a moment, then walked away without paying. De Oliveria turned to Smith, thinking Smith would pay him. Instead, Smith pulled an automatic or semiautomatic gun from his waistband, put it against de Oliveria's head and said "Don't move. Give me everything that you have." Smith took de Oliveria's wallet, his iPhone, and $40 or $45 from his pockets. Then he struck de Oliveria in the head with the handle of his gun and said " 'you lost.' " Smith and the woman walked away toward a dead end on Inyo Avenue. Smith was laughing and holding the waistband of his pants with both hands.

At trial, de Oliveria identified Smith as the man who robbed him. The area where the robbery occurred was poorly lit, but de Oliveria saw everything that happened clearly. Smith's hair was shorter on the night of the robbery but de Oliveria recognized his face

3

and coloring.  De Oliveria's driver's license says he is 5'6" tall, and he testified that the robber was taller than him.[1]  De Oliveria told the police the robber was 5'11".

De Oliveria recognized "Lola" at a court proceeding several months before trial. No one told him she would be present in court, and he was not asked to identify her at that time.

### Jin Hua Chen

Jin Hua Chen worked for his father's Chinese restaurant.  On October 21, 2013, Chen took a phone order for food to be delivered to East 23rd Street and Inyo Avenue. The phone number for the order was (510) 467-6933.  Chen did not see anyone when he got there, so he called the phone number and the woman who placed the order answered. Chen said he was outside and asked her to come out.  A woman emerged a few minutes later and Chen gave her the food.  As she pulled out her purse as if to pay, a man wearing a hooded sweatshirt approached from behind her and pointed a short, black gun at Chen from about a foot and a half away.  Chen thought the gun was a semiautomatic.  The man said, "If you don't give me all your money, I'm going to shoot you in the head."  At trial, Chen identified Smith as the robber.

Chen pulled about $200 from his wallet and gave it to Smith.  Smith asked for Chen's phone, but Chen said he did not have one.  Chen walked away.  Smith followed him to his car, and then he and the woman walked toward the dead-end on Inyo.

Chen testified that he is 5'8" tall and the man who robbed him was about six feet tall.  Chen recognized the woman robber in the courtroom when he testified at the preliminary hearing.

### Smith's Police Interview

Smith was arrested the evening of the Jacko robbery.  He waived his *Miranda*[2] rights and was interviewed by Sergeant Todd Mork and Officer Michael Troupe the

---

[1] There is no indication in the record that Smith was asked to stand up when any of the witnesses identified him in court.

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

morning after his arrest.   A video recording of the interview was played for the jury. Smith initially claimed that the previous night he and his girlfriend Yohana—the woman he was arrested with—were at his friend Kevin's house all day until 8:00 p.m., when he, Yohana and Kevin got a ride to a Popeye's restaurant.  After they ate, around 10:00 p.m., Smith and Yohana got dropped off at a store where they bought soda.  They were walking from the store when the police stopped them.  The phone Smith was carrying belonged to his friend Antoine, who let him borrow it.

Sergeant Mork explained that he knew Smith was the robber and that he only wanted to know why Smith had done it.  He asked, "Did you need money for rent? Did you need money for—you know."  Smith responded, "Yeah.  I'm just sayin' it is hard out there—I mean it's hard."  A little later Mork asked, "I mean, do you need the money for food and rent and stuff?  Is that what it is?"  Smith answered, "You could say that." Mork said "I'd like to hear it from you," and this time Smith said "Yeah."   Sergeant Mork asked Smith whether the money was the only thing he took from Jacko.  Smith said, "That's the only thing that he had on him."

Sergeant Mork asked Smith whether this was the first time he and Yohana robbed someone.  Smith answered "It's—it's not the first time we did that but shit—I don't know.  Shit we just to survive [*sic*]."  Sergeant Mork asked whether Smith and Yohana had taken food from a Chinese restaurant delivery man.  After some evasive answers, Smith nodded affirmatively.[3]   When Mork asked if he had the delivery man's wallet, Smith said "I don't know."  When Sergeant Mork asked Smith "So how did this one go down?" Smith first responded "I never said it did so I don't know," but when Mork repeated the question he said "Doing the same (unintelligible) shit.  We just shit . . . ."  A little later, Mork again asked Smith if he took the Chinese food and the delivery man's wallet Smith said "No.  I did the black person."

---

[3] After the jury viewed the taped interview, Officer Troupe testified that Smith nodded affirmatively when Sergeant Mork asked about taking food from the Chinese restaurant and again when Mork asked if he remembered the Domino's pizza delivery man.

Sergeant Mork also asked Smith about the de Oliveria robbery on October 15 and whether he took de Oliveria's pizzas, iPhone, money and wallet. Smith said he didn't remember. Then Mork asked if he had robbed a Domino's Pizza delivery woman on October 2.[4] This time, Smith nodded his head affirmatively and said "Yeah." Asked what he did with her stuff, Smith said that "She didn't have nothing." Smith repeatedly denied that he owned or used a gun.

*Smith's Testimony*

Smith denied robbing de Oliveria, Jacko, Chen or anyone else. He was tired and nodded off when the police interviewed him because he had taken ecstasy and smoked marijuana; he did not "[shake] his head yes" when the officer asked if he had robbed someone. Smith felt it didn't matter what he told the officers because they didn't believe what he said and weren't going to let him go.

Yohana was one of Smith's girlfriends. He was not with her on October 2, 15 or 21 and he never knew her to use the name "Lola." Yohana came to see him at the preliminary hearing and sat in the audience.

Smith gave markedly inconsistent and confusing accounts of his activities the day he was arrested. He testified he was at Antoine's house for an hour or two until he left around 3:00 or 4:00 p.m. to go to his friend Donte's house, although he also said he got to Antoine's house around 8:00 or 9:00 in the morning. He borrowed Antoine's phone and took it with him when he left; that was the phone he was carrying when he was arrested. He went to Donte's house at 6:00 or 7:00 that evening. Later he testified he went from Antoine's house to Donte's around 3:00 p.m.

Yohana came by Donte's around 9:00 or 10:00 p.m., and they left to go to the store. Initially Smith testified Donte drove them to the store, but he later said they

---

[4] Smith was charged with robbing Maynunah Rasheed on October 2, 2013. Rasheed testified that she was robbed by an African American man and woman when she tried to deliver a pizza to a woman named Lola at 2235 East 23rd Street. The man took her handbag, but all it contained was a taser, a pen and a flashlight. The court dismissed the charges related to the October 2 robbery under Penal Code section 1118.1 after Rasheed was unable to identify Smith in court.

6

walked to the store from Antoine's house. Smith said he and Yohana were only together 20 or 30 minutes before police arrested them, but then he said they were at Donte's for a couple of hours, and later changed that to less than an hour and said he left Donte's for the store before 8:00 p.m. Smith and Yohana finished shopping and were arrested within 20 minutes of the time they left for the store. Smith could not explain how it was that they were not arrested until 11:00 p.m., three hours after he said they left Donte's.

Smith also testified that he and Yohana met up earlier, at Antoine's house, at "nighttime kind of. Not all the way nighttime." It was dark out, maybe 9:00 or 10:00 p.m. They went to the store from Antoine's. They had been at Donte's house "way before" that, in the evening. Yohana came over to Donte's, but left and came by Antoine's later at night. Smith had been at Antoine's house first, then someone whose name he did not know picked him up at Antoine's and drove him to Donte's around 3:00. Around 8:00 or 9:00 p.m. a friend named D. picked him up at Donte's and drove him to Antoine's house. Yohana arrived around 10:00 and they left for the store "as soon as she got there . . . like five minutes after she got there." Asked about his testimony that Yohana arrived about 30 minutes before they left, Smith said that they "didn't actually go straight to the store."

Smith acknowledged that he lied when he told police he was with Yohana the previous night, and when he said he spent the night with Kevin. He was scared and didn't want to get anyone in trouble. Smith did not know anyone named Kevin.

*Verdict and Sentence*

The jury found Smith guilty of robbing Chen, Jacko and de Oliveria and assaulting de Oliveria with a semiautomatic firearm, and found the firearm use allegations true. The court imposed the aggravated five-year term for the de Oliveria robbery with a consecutive ten-year term for the firearm enhancement; imposed and stayed a 16-month term with a three-year enhancement for the assault; and imposed and stayed two concurrent one-year terms with ten-year enhancements for the Jacko and Chen robberies. Imposition of sentence for Smith's conviction of assault with a semiautomatic firearm was stayed pursuant to section 654.

Smith filed this timely appeal.

## DISCUSSION

### I. The *Evans* Motion

Smith contends the court abused its discretion when it denied his motion for a pretrial lineup pursuant to *Evans, supra,* 11 Cal.3d 617. We disagree. The court determined the motion was brought too late and that Smith's arguments about the witness identifications were more appropriately made to the jury. The ruling was well within the court's discretion.

*Background*

Smith was arrested on October 22, 2013, and charged by complaint two days later. On March 10, 2014, he filed a motion requesting a pretrial lineup in which he would appear before the four robbery victims. Smith argued there was a reasonable likelihood of mistaken identification [b]ased on the remote identification [] of the defendant in only one of four robberies, based on being primarily with a black woman, the suggestiveness of the field show-up, the brevity of the incident, and defendant's denial of the crimes charged."

The prosecutor opposed the motion. She argued that too much time had elapsed since Smith's arrest the previous October and that the preliminary hearing had been rescheduled multiple times. She also maintained an *Evans* lineup was inappropriate because Jacko identified Smith immediately after the robbery; Smith was arrested with the phone used in all four robberies; and he was arrested in the company of a woman who matched the descriptions from all four crimes, was also identified in the in-field show-up, and pleaded guilty to the robberies.

Defense counsel apologized for her delay in bringing the motion "because I was in trial from November 12th until last Thursday, when the jury came back and acquitted my client, so that's my only explanation. It's not an excuse, but an explanation for the delay." On the merits, she argued that Yohana had committed a series of robberies with different African American men, Smith just happened to be with or near her when she robbed Jacko, and there was "absolutely no evidence to connect him—other than being

8

an African American male in Oakland, to connect him to the other three robberies. And I would say that the *Evans* motion should be granted as to the first three robberies to give the witnesses an opportunity to either pick out my client or not pick out my client. It's cheaper than a trial."

The court denied the motion. It explained that "it's been 142 days at least that your client has been in custody and that's problematic in terms of the time element. [¶] And the arguments that you make, I think, are better made to a trial jury, so this motion is denied." A month later, on April 7 and 8, 2014, Chen and Jacko identified Smith at the preliminary hearing; de Oliveria did not testify. The trial began on August 25.

## DISCUSSION

"[D]ue process requires in an appropriate case that an accused, upon timely request therefore, be afforded a pretrial lineup in which witnesses to the alleged criminal conduct can participate. The right to a lineup arises, however, only when eyewitness identification is shown to be a material issue and there exists a reasonable likelihood of a mistaken identification which a lineup would tend to resolve." (*Evans, supra,* 11 Cal.3d at p. 625.) "The questions whether eyewitness identification is a material issue and whether fundamental fairness requires a lineup in a particular case are inquiries which necessarily rest for determination within the broad discretion of the magistrate or trial judge. [Citation.] We do not hold, accordingly, that in every case where there has not been a pretrial lineup the accused may, on demand, compel the People to arrange for one. Rather, as in all due process determinations, the resolution here to be made is one which must be arrived at after consideration not only of the benefits to be derived by the accused and the reasonableness of his request but also after considering the burden to be imposed on the prosecution, the police, the court and the witnesses." (*Ibid.*)

"The broad discretion vested in a trial judge or magistrate includes the right and responsibility on fairness considerations to deny a motion for a lineup when that motion is not made timely. Such motion should normally be made as soon after arrest or arraignment as practicable. We note that motions which are not made until shortly before

9

trial should, unless good cause is clearly demonstrated, be denied in most instances by reason of such delay." (*Evans, supra,* 11 Cal. 3d at p. 626.)

Smith maintains it was an abuse of discretion to deny his motion because, quoting *Evans*, it was made " 'as soon as practicable' " after his arrest or arraignment. (*Evans, supra,* 11 Cal. 3d at p. 626.) But the trial court found the lapse of "at least 142 days" between Smith's arrest and his request for a lineup was not "as soon as practicable," and we cannot fault that conclusion. The request was made more than four months after Smith's arrest, a period during which the witnesses' memories could have faded and Smith's appearance could have changed. The trial court could also reasonably find defense counsel's explanation for the delay was inadequate. Counsel attributed it to another trial that lasted from November 12 until March 13, but she gave no reason for failing to promptly request a lineup before November 12 or enlist associate counsel to do so while she was occupied with her other case.

Smith argues that the critical focus under *Evans* is "not on the time lapsed from the arrest or complaint but on the proximity to trial." But that is not what *Evans* says. Indeed, in *People v. Abel* (2012) 53 Cal.4th 891, in response to a defense argument that a belated *Evans* motion was appropriate because a continuance of the trial after the motion was filed lessened the burden on the prosecution, the Court expressly refuted the argument Smith makes here: "[A] lineup is always burdensome, *and that the trial was continued does not justify defendant's delay in making the motion.*" (*Id.* at pp. 912–913, italics added.)

We are also unpersuaded that counsel's failure to bring a timely *Evans* motion constituted ineffective assistance of counsel. To establish ineffective assistance of counsel, a defendant must show both that his attorney's performance fell below an objective standard of competence and a reasonable probability of resulting prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) "Unless a defendant establishes the contrary, we shall presume that 'counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.' " (*People v. Ledesma* (2006) 39 Cal.4th 641, 746.) "If the

10

record 'sheds no light on why counsel acted or failed to act in the manner challenged,' an appellate claim of ineffective assistance of counsel must be rejected 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' " (*Ibid*.)

At the *Evans* hearing in this case counsel told the court that her other trial was "my only explanation. It's not an excuse, but an explanation for the delay." But able counsel could reasonably believe it would better serve her client to delay any lineup until, if one were permitted, the chances of a positive identification might have decreased as the events became remote, and a positive identification could be challenged based on the passage of time. To be clear, we do not mean to imply that counsel was dishonest with the court. However, her carefully worded explanation did not rule out the possibility that tactical considerations as well as the press of business informed the timing of Smith's *Evans* motion.

In the end, though, Smith's claim of ineffective assistance of counsel would fail even if counsel's explanation for the delay were unambiguous. As we have noted, the court denied the motion on the merits as well as due to its untimeliness: "[T]he arguments that you make, I think, are better made to a trial jury, so this motion is denied." The record suggests no reason to think the court would have viewed the value of a pretrial lineup differently had Smith asked for one sooner. As Smith has not shown a reasonable probability that an earlier motion would have prevailed, his ineffective assistance claim cannot prevail. (*Strickland v. Washington, supra,* 466 U.S. at p. 687.)

## II. *Smith's request that de Oliveria describe his assailant before seeing Smith in court*

Smith argues the court abused its discretion and denied him due process of the law when it denied his request to have Mr. de Oliveria describe him before viewing him in court. Here too, we disagree.

### *Background*

Mr. de Oliveria did not see Smith between the night he was robbed and the trial. Shortly before de Oliveria was to testify, Smith's attorney asked that her client be seated out of de Oliveria's direct view when de Oliveria took the stand. She argued that

11

because de Oliveria had not previously identified Smith and had described the robber only as an African-American male, "this is unduly suggestive to my client, to have my client sit here and have the witness stare at him and describe him and identify him as the robber or the person who is behind him. . . . I believe it's an issue of due process at this point. My client has a right to have an identification that's made." Asked for legal grounds for the request, defense counsel stated she was relying on the authorities cited in Smith's *Evans* motion.

The court reviewed the *Evans* motion and denied the request. It explained that, like the arguments Smith raised in support of a lineup, "those go to the weight and to cross-examination. That is fertile ground for cross-examination, and I will entertain any suggested factors that you would like me to include in the jury instruction."

*Discussion*

There seems to be no California authority directly on point, but general principles well established in our state undermine Smith's contention that the ruling was an abuse of discretion and violated due process guarantees.

In *People v. Rodrigues* (1994) 8 Cal.4th 1060, the Supreme Court rejected a claim that the trial court abused its discretion when it found the defendant was not incurably prejudiced by a prosecutor's failure to promptly notify him of a potential identification witness. The defendant argued the delay prevented him from "test[ing] [the witness's] ability to make an identification in a nonsuggestive atmosphere." (*Id*. at p. 1155.) The Court disagreed. Making reference to *Evans* it explained: "Insofar as defendant contends that an in-court identification not preceded by a lineup is impermissibly suggestive and prejudicial as a matter of law, he is wrong. [Citation.] He is also mistaken in his assertion that once Mitchell made his in-court identification of defendant, 'there was no effective way to ameliorate its impact and no way to balance the playing field between the prosecution and defense.' To the contrary, it has long been recognized that '[i]n the case of in-court identifications not preceded by a lineup . . . , the weaknesses, if any, are directly apparent at the trial itself and can be argued to the court and jury without the

12

necessity of depending on an attempt to picture a past lineup by words alone.' " (*Id.* at p. 1155.)

The Ninth Circuit has similarly recognized that, although initial in-court identifications are inherently suggestive, it is an abuse of the court's discretion to deny a request for a less suggestive procedure *only* if the resulting identification is "so ' "unnecessarily suggestive and conducive to irreparable misidentification" as to amount to a denial of due process of law. . . .' " (*United States v. Domina* (9th Cir. 1986) 784 F.2d 1361, 1369 (*Domina*).) Quoting the United States Supreme Court, *Domina* foreshadowed *Rodrigues* when it observed that " '[c]ounsel can both cross-examine the identification witnesses and argue in summation as to factors causing doubts as to the accuracy of the identification—including references to both any suggestibility in the identification procedure and any countervailing testimony such as alibi.' " (*Ibid*, quoting *Manson v. Brathwaite* (1977) 432 U.S. 98, 113–114, fn.14.) But "[t]here is no constitutional entitlement to an in-court line-up or other particular methods of lessening the suggestiveness of in-court identification, such as seating the defendant elsewhere in the room. These are matters within the discretion of the court." (*Domina* at p. 1369; accord, *United States v. Williams* (9th Cir. 1970) 436 F.2d 1166, 1168.)

Here, defense counsel cross examined de Oliveria about his description of the two suspects and the circumstances in which he saw them. She asked that the record reflect that he looked at Smith as he prepared to describe what he recognized about him from the night of the robbery. The trial court instructed the jury on the factors affecting the accuracy of eyewitness identification, including whether the witness was asked to pick the perpetrator out of a group and whether he or she was able to identify the defendant in a photographic or physical lineup. Defense counsel challenged de Oliveria's and the other victims' identifications at length during closing argument. On this record, the standard procedure by which de Oliveria identified Smith in court was neither an abuse of the court's discretion nor a violation of his right to due process of law.

It is true, as Smith argues and both our state and federal Supreme Courts have acknowledged (see *Abel, supra,* 53 Cal.4th at pp. 891, 913; *Moore v. Illinois* (1997) 434

13

U.S. 220, 230 fn. 5), a defendant's presence at the defense table is inherently suggestive. But neither holds, as Smith urges us to do, that "in-court identification is unnecessarily suggestive when alternative procedures are readily available." To the contrary, while *Moore* observed that seating the defendant away from the defense table is one of various ways courts may ameliorate such suggestiveness, it *affirmed* that "such requests are ordinarily addressed to the sound discretion of the court" and expressly declined to opine on whether, had the request been made, the trial court would have been required to grant it. (*Ibid.*) Here, where Smith's counsel vigorously challenged the witness identification testimony through cross-examination and argument and the jury was instructed on how to assess such testimony, the court reasonably determined Smith's due process rights were adequately protected. There was no abuse of discretion.

## DISPOSITION

The judgment is affirmed.

_____
Siggins, J.


We concur:


_____
Pollak, Acting P.J.


_____
Jenkins, J.

14