UNITED STATES of America,
Plaintiff-Appellee,

v.

Gary Stephen DOMINA,
Defendant-Appellant.

No. 84–1045.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 12, 1984.

Decided March 17, 1986.

Leida B. Schoggen, San Jose, Cal., for plaintiff-appellee.

John A.D. Kelley, Palo Alto, Cal., for defendant-appellant.

Before HUG, SCHROEDER and BEEZ-ER, Circuit Judges.

HUG, Circuit Judge:

Domina appeals from a conviction on four counts of bank robbery and one count of possession of a firearm by an ex-felon. He contends he was deprived of his sixth amendment right to confront a principal witness against him by a limitation on the cross-examination of that witness. He also contends he was deprived of due process because the identification of him by three witnesses was impermissibly suggestive. He raises several other issues, which we discuss briefly. We affirm the conviction.

## I.

### Procedural Status

Domina was indicted for four separate armed robberies of savings and loan institutions in violation of 18 U.S.C. §§ 2 and 2113(a) and (d) (1982). In addition, he was indicted for possession of a firearm by an ex-felon in violation of 18 U.S.C. § 1202 (1982) and also for a conspiracy count that was dropped prior to trial. He was tried before a jury on the four bank robbery charges. Pursuant to a stipulation, the firearm count was decided by the judge based upon the evidence adduced at the jury trial. He was convicted on all counts and now appeals those judgments.

## II.

### Facts

The principal witness was Miller Edward Purnell, ("Purnell"), who was originally charged with Domina, and who pled guilty to one of the robbery counts. He testified that he had participated in the robberies of the four savings and loan institutions as the driver of the get-away car. His account of the details concerning each robbery follows.

Purnell and Domina met in May, 1983. On June 10, 1983, Domina and Purnell drove near the Camden area of San Jose and discussed the possibility of robbing a bank. The next morning, June 11, they drove to Home Federal Savings and Loan ("Home Federal") in Domina's green Pinto. While Purnell waited in the car, Domina, wearing a beanie pulled down over his face like a ski mask and carrying a sawed-off shotgun, entered Home Federal's side entrance. After Domina was inside for a short while, he came out, jumped into the car, and told Purnell to drive off. Purnell drove them to the residence of Purnell's friend, Marvita Cole, where he and Domina switched the car's license plates and divided the money obtained from the robbery. Cole was unaware of their illegal activity. Purnell and Domina engaged in three subsequent robberies, again robbing the same branch of Home Federal on June 20, 1983, then Fidelity Federal Savings and Loan Association ("Fidelity Federal") on June 21, 1983, and Glendale Federal Savings and Loan ("Glendale Federal") on July 1, 1983. Each of the subsequent robberies followed the same pattern of events as that of the first robbery. He drove Domina to the savings and loan; Domina entered, wearing a beanie-like ski mask and carrying a sawed-off shot gun. After Domina conducted the robbery and came out with the money, Purnell drove him to Marvita Cole's garage, where they switched license plates on the car and divided the money. Purnell admitted his involvement and led the police to the garage, where they recovered the shot gun, ammunition, two masks, and other evidence Purnell testified was used in the robberies.

The defense concedes that it was proved that Purnell was implicated in these robberies. The only question was whether it was Domina who was the robber accompanying Purnell, as Purnell contended. It was also clear that Purnell drove to and from the robberies in Domina's green Pinto automobile, as Purnell testified. Several tellers identified the Pinto driving away from the scene. A retired deputy sheriff had noticed the green Pinto suspiciously parked outside Glendale Federal and had been watching when the robber came out and drove away as a passenger in the Pinto. He obtained the license number, which was that of the license plate found with the gun and other evidence in Marvita Cole's garage.

Marvita Cole testified that Purnell and Domina had asked to use her garage and

that, four or five times during the summer, they had pulled the green Pinto into her garage, closed the doors, and asked that nobody come in. There was also additional testimony that the green Pinto belonged to Domina. There were six surveillance photos of the robber during the last three robberies, but none of the first robbery. The robber in the six photos appeared to be the same person.

Only three of the tellers who testified at trial gave identification testimony. Gina Bishoff identified Domina as the robber in the first robbery (Home Federal). Eleanor Newton testified about the third robbery (Fidelity Federal) and indicated that she could possibly identify the defendant as the robber if he put on the mask. The court ordered him to do so, over the objection of the defense. Newton then testified that Domina, with the mask on, looked similar to the robber she saw. She based this on his long neck and long nose which made the mask protrude. Linda Dowdy testified about the fourth robbery (Glendale Federal). She believed she could identify the robber by his voice. The court, over defense objection, ordered Domina to say two phrases that the robber had spoken: "Ladies, this is a hold-up" and "Put all the money in the bag." After the defendant did so, Dowdy testified, "That is the voice I heard." On cross-examination, she modified her testimony to say that the voice was very similar.

The evidence was overwhelming that Purnell participated in the four robberies with another person of Domina's general appearance, in Domina's car, and that Domina had accompanied Purnell to Marvita Cole's garage four or five times during the period in question. The defense advanced by Domina was that it was someone other than Domina who accompanied Purnell during the robberies.

### III.

### *Limitation of the Scope of Cross-Examination*

■ Domina claims that the district court improperly limited his cross-examination of Purnell by not permitting the defense to explore whether drug use adversely affected Purnell's credibility. The Sixth Amendment to the United States Constitution guarantees an accused in a criminal prosecution the right to cross-examine adverse witnesses. *Davis v. Alaska*, 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1109–10, 39 L.Ed.2d 347 (1974); *United States v. McClintock*, 748 F.2d 1278, 1289 (9th Cir. 1984), *cert. denied*, —— U.S. ——, 106 S.Ct. 75, 88 L.Ed.2d 61 (1985). This right is subject to the broad discretion of a trial judge to preclude harassment or unduly prejudicial interrogation. *Davis*, 415 U.S. at 316, 94 S.Ct. at 1110; *Batchelor v. Cupp*, 693 F.2d 859, 864 (9th Cir.1982), *cert. denied*, 463 U.S. 1212, 103 S.Ct. 3547, 77 L.Ed.2d 1395 (1983). We review the district court's limitation of the scope of cross-examination for an abuse of discretion. *McClintock*, 748 F.2d at 1289.

■ Following Purnell's testimony on direct examination, the district court conducted an *in limine* hearing concerning the limitation of cross-examination about Purnell's drug usage. At the *in limine* hearing, the district judge afforded a full opportunity for the defense to explore the extent of Purnell's use of drugs and its effect on his credibility. At the conclusion of the *in limine* hearing, the district court concluded that Domina failed to establish an adequate foundation to justify an inquiry on cross-examination into how drug use affected Purnell's credibility as a witness.

Domina contends that the district court applied the wrong standard in assessing the effect on credibility because the court concentrated only on the questions of whether Purnell's testimony was offered while he was under the influence of narcotics and whether he was under the influence of narcotics at the time of the robberies so as to affect his perception of the events. It is true that the trial judge initially expressed these as his primary concerns and that the questioning of Purnell concentrated on these concerns. However, the court

did not restrict the questioning to these areas and, in fact, asked at the conclusion of examination by Domina's attorney on this matter, "Any other questions? ... I want to see if they want to lay any further foundation." No further questions on this subject were asked, nor was any further foundation laid.

Domina now contends that the court should have evaluated the possible effect that drug usage might have on Purnell's bias as a witness because his drug dependence made him especially susceptible to police influence or pressure. We have recognized that narcotics addicts are more susceptible to police manipulation and intimidation. *See United States v. Kizer*, 569 F.2d 504, 506 (9th Cir.) (cross-examination on drug use may be necessary where the record reveals that drug use may have provided motivation for testifying), *cert. denied*, 435 U.S. 976, 98 S.Ct. 1626, 56 L.Ed.2d 71 (1978); *United States v. Kinnard*, 465 F.2d 566, 571 (D.C.Cir.1972) (Bazelon, C.J., concurring). *See also* J. Weinstein & M. Berger, Weinstein's Evidence, ¶ 607[04] at 607–51 (1985) ("evidence of drug involvement is ... often relevant on the issue of bias as indicating why a witness is cooperating with the government— and in such cases probative value may be sufficiently high to offset the danger of prejudice."). In this case, however, there was no foundation whatsoever laid at the *in limine* hearing justifying any inference that drug usage or addiction had led to any manipulation or inducement by the police, such as supplying or withholding narcotics, and there was no indication that Purnell's narcotics use played any part in his willingness to testify, or affected the nature of his testimony. No questions were asked that even broached this possible basis for bias. The other arguments on appeal, that he may have been protecting a drug supplier or was seeking to convict Domina to prevent him from some sort of drug retribution, are pure speculation without any foundation in the record.

At trial, there was considerable other cross-examination seeking to establish the bias of Purnell. The cross-examination revealed that, after his arrest, Purnell was anxious to cooperate with the police in exchange for favorable treatment. Purnell's plea bargain with the Government was also examined, as well as the fact that Purnell was awaiting sentencing and hoped to receive lenient treatment as a result of his cooperation. Purnell's possible bias due to his desire to be helpful to the police was vigorously explored in this context. The potential vulnerability to police manipulation because of any drug dependence would not have added much, if anything, to the potential bias already presented. The jury was made well aware of the necessity to assess Purnell's credibility in light of this potential bias.

The evidence adduced at the *in limine* hearing did indicate that Purnell used narcotics during the months when the robberies took place, but he denied that he was under their influence at the time of the robberies. The jury was able to test his perception and memory against the testimony of the various bank tellers and a witness who observed the green Pinto outside one of the savings and loan institutions. Furthermore, the major importance of Purnell's testimony was not in the details of each robbery, where fuzzy perception or faulty memory would be important; rather, the significance of his testimony was that it was Domina that he drove to each savings and loan institution. There was no doubt that Purnell participated in the robberies; the question was only whether it was Domina and not someone else that accompanied him. This has little to do with perception or memory; either Purnell truthfully identified Domina or it was an intentional lie.

There was no indication that Purnell was under the influence of drugs at the time he testified at trial. The district judge even offered the defense the opportunity to have him examined by a doctor for that purpose, if the defense so desired. It did not seek to do so.

As we have observed, the issue of narcotics use must be handled with some sensitiv-

ity because it can result in unnecessary prejudice and hostility toward a witness. *Kizer*, 569 F.2d at 506. The district judge did not abuse his discretion in balancing the probative value of the desired cross-examination against its potential prejudice, and the restriction of the cross-examination did not violate the confrontation clause of the sixth amendment.

## IV.

### *Identification Testimony*

On the opening day of trial, Domina's attorney pointed out that there had been no pretrial identification procedures conducted by the police or prosecution, and that to permit in-court identification with the defendant's presence obvious to the witnesses would be unduly suggestive. He contended that if this initial identification procedure were to have been conducted outside the courtroom, the Government would had to have followed procedures, such as a line-up or a photo display, that would eliminate the suggestiveness of having the witness view only one person to determine if he was the robber. He observed that if the initial identification was in court, the court would be permitting suggestiveness in court that would be impermissible out of court. He therefore asked that such testimony be excluded. As an alternative, he requested an in-court line-up. The district court denied both requests.

There has been considerable concern expressed by the courts and the commentators about the doubtful reliability of eye witness identification testimony and the importance that may be attached to that evidence by a jury. *See United States v. Wade*, 388 U.S. 218, 225–29, 87 S.Ct. 1926, 1931–33, 18 L.Ed.2d 1149 (1967); P. Wall, Eye-Witness Identification in Criminal Cases.

Historically, the identification testimony of eye witnesses had been permitted even though the opportunity for observation was minimal or there were serious questions of reliability. This testimony, like other testimony of witnesses that might be of doubtful reliability, had been considered to involve questions of credibility, not admissibility and, thus, matters for the jury to weigh. The availability of cross-examination and arguments of counsel to point out the weaknesses in the testimony had been considered adequate safeguards.

The Supreme Court in a line of cases modified this historical view and established rather stringent requirements for pretrial identification procedures, the violation of which will not only preclude the admission of evidence of the pretrial identification itself, but may also preclude a later in-court identification that was tainted by the earlier suggestive procedures. *Neil v. Biggers*, 409 U.S. 188, 200–01, 93 S.Ct. 375, 382–83, 34 L.Ed.2d 401 (1972); *Coleman v. Alabama*, 399 U.S. 1, 5–6, 90 S.Ct. 1999, 2001, 26 L.Ed.2d 387 (1970); *Foster v. California*, 394 U.S. 440, 442, 89 S.Ct. 1127, 1128, 22 L.Ed.2d 402 (1969); *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968); *Stovall v. Denno*, 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199 (1967); and *Gilbert v. California*, 388 U.S. 263, 272, 87 S.Ct. 1951, 1956, 18 L.Ed.2d 1178 (1967); *United States v. Wade*, 388 U.S. at 241, 87 S.Ct. at 1939.

The contours of the constitutional requirements were set out in this line of cases, indicating when the evidence of the pretrial identification had to be excluded and when an in-court identification, that followed a constitutionally defective pretrial identification, had to be excluded. The stress in these cases was on the taint that a prior suggestive pretrial identification could have on the later in-court identification. Justice Brennen in the majority opinion in *Wade* noted that there is grave potential for prejudice in a pretrial line-up, which may not be capable of reconstruction at trial. 388 U.S. at 236, 87 S.Ct. at 1937. The opinion further states:

> Moreover, "[i]t is a matter of common experience that, once a witness has picked out the accused at the line-up, he is not likely to go back on his word later on, so that in practice the issue of identi-

ty may (in the absence of other relevant evidence) for all practical purposes be determined there and then, before the trial."

*Id.* at 229, 87 S.Ct. at 1933 (quoting from Williams & Hammelmann, Identification Parades, Part I, [1963] Crim.L.Rev. 479, 482). Justice White in his dissenting and concurring opinion noted that the majority opinion does not bar courtroom identification where there have been no previous identifications, *id.* at 253, 87 S.Ct. at 1946.

In all of these cases, the Supreme Court was delineating the standards of when the pretrial identification had to be excluded or under what circumstances an in-court identification that followed an impermissible pretrial identification had to be excluded. None of these cases has set any guidelines for in-court identification procedures nor indicated that in-court identification must be made in a way that is not suggestive. When the witness identifies the defendant from the witness's observations at the time of the crime, this testimony has generally been held admissible unless tainted by the prior suggestive identification process.

Some courts, however, have expressed concern about the suggestiveness of the in-court identification process itself. When the witness is asked if he or she can identify the defendant as the perpetrator of the crime, this is surely equivalent to the "show-up" pretrial situation. Only slightly less suggestive is the procedure whereby the witness is asked if he or she can identify the perpetrator of the crime from among those present in the courtroom when the defendant is sitting at the defense counsel table. *See United States v. Archibald,* 734 F.2d 938, 941–42, *modified,* 756 F.2d 223 (2d Cir.1984); *United States v. Brown,* 699 F.2d 585, 594 (2d Cir.1983). Although there is not a direct holding to this effect, the Eleventh Circuit has indicated that in the absence of a pretrial identification the same standards applicable to pretrial identification as set forth in *Neil v. Biggers,* 409 U.S. at 198, 93 S.Ct. at 381, ought to be applied to the in-court identification. *Code v. Montgomery,* 725 F.2d 1316, 1319 (11th Cir.1984). However, no

holding of the Supreme Court nor of this circuit has mandated such a requirement.

The concern with in-court identification, where there has been suggestive pretrial identification, is that the witness later identifies the person in court, not from his or her recollection of observations at the time of the crime charged, but from the suggestive pretrial identification. *United States v. Jarrad,* 754 F.2d 1451, 1455 (9th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 96, 88 L.Ed.2d 78 (1985). Because the jurors are not present to observe the pretrial identification, they are not able to observe the witness making that initial identification. The certainty or hesitation of the witness when making the identification, the witness's facial expressions, voice inflection, body language, and the other normal observations one makes in everyday life when judging the reliability of a person's statements, are not available to the jury during this pretrial proceeding. There is a danger that the identification in court may only be a confirmation of the earlier identification, with much greater certainty expressed in court than initially.

When the initial identification is in court, there are different considerations. The jury can observe the witness during the identification process and is able to evaluate the reliability of the initial identification. On the other hand, there can be little doubt that the initial in-court identification is suggestive. In *United States v. Williams,* 436 F.2d 1166 (9th Cir.1970), *cert. denied,* 402 U.S. 912, 91 S.Ct. 1392, 28 L.Ed.2d 654 (1971), we noted the inherent suggestiveness of in-court identifications:

When asked to point to the robber, an identification witness—particularly if he has some familiarity with courtroom procedures—is quite likely to look immediately at the counsel table, where the defendant is conspicuously seated in relative isolation. Thus the usual physical setting of a trial may itself provide a suggestive setting for an eye-witness identification.

*Id.* at 1168.

Obviously, procedures could be used in court to lessen the suggestiveness, such as

an in-court line-up, or having the defendant sit somewhere in the courtroom other than the defense table. Domina did make a request for an in-court line-up for the identification witnesses, which was denied. The Supreme Court has not extended its exclusionary rule to in-court identification procedures that are suggestive because of the trial setting. The Supreme Court noted in *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), that the due process interest protected when suggestive identification evidence excluded is an *"evidentiary* interest," and stressed the "limited extent of that interest in our adversary system." *Id.* at 113, 97 S.Ct. at 2252. The Court quoted with approval a D.C. Circuit case in stating:

> In essence what the *Stovall* due process right protects is an evidentiary interest....
>
> It is part of our adversary system that we accept at trial much evidence that has strong elements of untrustworthiness—an obvious example being the testimony of witnesses with a bias. While identification testimony is significant evidence, such testimony is still only evidence, and, unlike the presence of counsel, is not a factor that goes to the very heart—the "integrity"—of the adversary process.
>
> Counsel can both cross-examine the identification witnesses and argue in summation as to factors causing doubts as to the accuracy of the identification—including reference to both any suggestibility in the identification procedure and any countervailing testimony such as alibi. *Clemons v. United States,* 133 U.S. App.D.C. 27, 48, 408 F.2d 1230, 1251 (1968) (concurring opinion) (footnote omitted), *cert. denied,* 394 U.S. 964 [89 S.Ct. 1318, 22 L.Ed.2d 567] (1969).

*Id.* at 113–14 n. 14, 97 S.Ct. at 2252–53 n. 14.

We have held that a district court's denial of a request for an in-court line-up is reviewed for an abuse of discretion. *United States v. Williams,* 436 F.2d 1166, 1168 (9th Cir.1970), *cert. denied,* 402 U.S. 912, 91 S.Ct. 1392, 28 L.Ed.2d 654 (1971); *ac-cord United States v. Robertson,* 606 F.2d 853, 857 (9th Cir.1979); *United States v. Kennedy,* 450 F.2d 1089, 1090 (9th Cir. 1971), *cert. denied,* 406 U.S. 924, 92 S.Ct. 1793, 32 L.Ed.2d 125 (1972); *United States v. MacDonald,* 441 F.2d 259 (9th Cir.), *cert. denied,* 404 U.S. 840, 92 S.Ct. 133, 30 L.Ed.2d 74 (1971). An abuse of discretion occurs only if the resulting in-court identification procedures are so " 'unnecessarily suggestive and conducive to irreparable misidentification' as to amount to a denial of due process of law...." *Williams,* 436 F.2d at 1168–69 (quoting *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967)).

 There is no constitutional entitlement to an in-court line-up or other particular methods of lessening the suggestiveness of in-court identification, such as seating the defendant elsewhere in the room. These are matters within the discretion of the court. *Id.* at 1168. We stated in *Williams* that "where the question of guilt or innocence hangs entirely on the reliability and accuracy of the in-court identification, the identification procedure should be as lacking in inherent suggestiveness as possible." *Id.* at 1168. This is not such a case; there was a great deal of other evidence linking Domina to the crimes. Furthermore, the jury had surveillance photos of the masked robber involved in three of the robberies to assist in evaluating the reliability of the identification testimony of the witnesses. Only Gina Bishoff said she could identify Domina as the robber. The other two tellers only stated that the robber's appearance and voice were similar to Domina's. Under the circumstances of this case, we hold it was not an abuse of discretion to refuse the defendant's request for an in-court line-up.

There were other objections to the identification testimony, which we will now examine.

## A. *Bishoff's Out of Court Identification*

 While Bishoff was waiting outside the courtroom to be called as a witness, she

saw a group of about 15 people exit from the courtroom during a recess, and she recognized Domina as the robber she had seen on June 11. He was not manacled or otherwise being escorted by the marshals in a way to single him out. Her attention was not directed to Domina by anyone pointing him out. She simply identified him from a group of people leaving the courtroom. She also testified that she did not know that Domina would be in court and did not know that she was going to be asked to identify anyone that was in court. As we noted above, whether evidence of pretrial identification must be suppressed under *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967), depends upon whether it was so unnecessarily suggestive as to give rise to irreparable mistaken identification when viewed under the totality of the circumstances. *United States v. Davenport*, 753 F.2d 1460, 1462 (9th Cir.1985). In this case, the viewing was accidental and was not so suggestive as to require exclusion of the out-of-court identification, and did not taint the later in-court identification.

### B. *Bishoff's In-Court Identification*

■ Bishoff was present during the June 11 robbery of Home Federal, but not the June 20 robbery. Surveillance photos were taken of the June 20 robbery, but not the June 11 robbery. The Home Federal officials showed her photos of the June 20 robber and she stated he was the same person involved in the June 11 robbery. Domina contends that Bishoff's viewing of the surveillance photos of the June 20 robbery tainted her in-court identification of him as the June 11 robber.

We have held that showing a witness to a crime the surveillance photos of that crime is not impermissibly suggestive. *United States v. Portillo*, 633 F.2d 1313, 1324 (9th Cir.1980), *cert. denied*, 450 U.S. 1043, 101 S.Ct. 1764, 68 L.Ed.2d 241 (1981). This, of course, differs from the present situation, in that Bishoff was shown photos of a person committing one crime on June 20, to determine if that was the same per-

son who committed the crime on June 11. The June 20 photos could be suggestive of Domina as the June 11 robber only if it was clear that Domina was the person in the June 20 photos. Domina would have to argue that the surveillance photos of the June 20 robbery so clearly identified him as the robber that Bishoff's identification of him as the June 11 robber was tainted by seeing the June 20 photos. Domina obviously does not advance this argument, for he contends that the June 20 photos were not of him.

At trial, Bishoff testified that she had an opportunity to observe the robber for 20 seconds and that she had been especially conscious of observing details because she had recently attended a meeting stressing such observation in case of robberies. She stated that although the robber was masked, she was able to identify Domina because of the forward protrusion of his nose, the shape of his face, the lower portion of his face not covered by the mask, and other facial features, as well as his general build and body features. Bishoff stated that she was 100% sure that Domina was the robber. In view of her opportunity to observe and the certainty of her in-court identification, admitting this in-court identification testimony was not an abuse of discretion.

### C. *Newton's In-Court Identification*

■ Over the objection of defense counsel, Domina was directed by the court to put on the mask. Newton was asked to look at him and to tell the jury whether he was the person who robbed Fidelity Federal on June 21. Newton could only say that he had the same general appearance. Domina contends that it was an abuse of discretion to require him to put on the mask to be viewed by Newton and the jury. There is no doubt that this action constitutes a show-up identification: the defendant was presented to the witness and the witness was asked if he was the robber.

As discussed earlier, the fact that the defendant is singled out in the courtroom as the object of a possible identification,

without more, is not a process which requires reversal. We then consider the effect of requiring the defendant to don the mask. Newton did not identify Domina, but only testified that from Domina's appearance in the mask, he looked similar to the robber she saw. From Newton's testimony, it is clear that she was basing her identification on Domina's long neck and protruding nose. Newton's testimony did no more than indicate that Domina could have been the robber. Similarly, after viewing Domina with the mask on, the jury was able to evaluate for itself how well an identification could be made and to compare his appearance to that of the person in the surveillance photos. This is probative evidence that would assist the jury in making its identification determination. This allowed the jury to test the validity of the details of the observations the witnesses relied upon in their testimony. We have previously held that it was not error to compel the defendant to wear a mask in similar circumstances, concluding that the probative value in assisting the jury to perform its fact-finding function outweighed any potential prejudice. *United States v. Satterfield*, 572 F.2d 687, 689–90 (9th Cir.), *cert. denied*, 439 U.S. 840, 99 S.Ct. 128, 58 L.Ed.2d 138 (1978). We conclude that it was not an abuse of discretion, in this case, to require Domina to put on the mask and to admit Newton's testimony.

### D. *Dowdy's Identification Testimony*

The pertinent questions and answers in Dowdy's testimony pertaining to identification were as follows:

Q. Is there any way you would be able to identify the man who robbed you?

A. Yes.

Q. How would you be able to do that?

A. By his voice.

Q. Is there any other way so far as you know?

A. No.

At the request of the prosecutor, and over the objection of defense counsel, the court required Domina to repeat two phrases that Dowdy testified the robber had said; "Ladies, this is a holdup." and "Put all the money in a bag." Dowdy then stated: "Yes that is the voice I heard."

On cross-examination the defense counsel asked, "As a matter of fact, isn't it true that as you sit here in the court today, all you can really say is that the voice you heard from my client is similar in nature to the voice that you heard in the bank on that day?" Dowdy responded, "Very similar."

■ Domina argues first that the requirement that he repeat the phrases as ordered by the court violated his fifth amendment rights against self-incrimination. In *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), the Supreme Court held that no fifth amendment right had been infringed when the accused was compelled, at a police line-up, to speak the words purportedly uttered by the robber. The Court stated:

[C]ompelling Wade to speak within hearing distance of the witnesses, even to utter words purportedly uttered by the robber, was not compulsion to utter statements of a "testimonial" nature; he was required to use his voice as an identifying physical characteristic, not to speak his guilt.

*Id.* at 222–23, 87 S.Ct. at 1930.

Courts have generally held that compelling a defendant to speak in court for purposes of allowing a witness to identify the defendant's voice does not violate fifth amendment self-incrimination principles. *See United States v. Williams*, 704 F.2d 315, 319–20 (6th Cir.), *cert. denied*, 464 U.S. 991, 104 S.Ct. 481, 78 L.Ed.2d 679 (1983), in which the Court so held and thoroughly discussed the case law on the subject.

■ In addition, Domina argues that requiring him to repeat, in the presence of the jury, the exact language the robber had purportedly uttered, was unduly prejudicial, creating an aura of guilt because of the words uttered. There is no doubt that it would have been a far better procedure

to have had Domina repeat neutral words as was done in the *Williams* case, where the defendant was asked to read aloud from a magazine. However, we do not find that the procedure utilized here was reversible error.

■■■ Newton's identification testimony is subject to the same arguments of suggestiveness previously discussed because attention was focused on the defendant. However, as in the case of the other two witnesses, the identification was done in open court in the presence of the jury with the availability of cross-examination to reveal the weaknesses of such a procedure and the witnesses' testimony. In fact, the cross-examination did bring out that the most Dowdy would state was that Domina's voice was low and very similar to the robber's.

■■■ If the only evidence tying Domina to the events of these robberies had been Dowdy's testimony that his voice was very similar to the robber's, or Newton's testimony that Domina's appearance in the mask was like that of the robber, there would be serious questions concerning the sufficiency of the evidence. Neither witness identified Domina as the robber, only that his voice and general appearance were similar. Bishoff positively identified Domina, but the jury had to consider how well she would be able to identify a masked robber. Under the circumstances of this case, it was not an abuse of discretion for the district court to allow the jury to consider this identification evidence along with the considerable other evidence linking Domina to these robberies. There was clearly sufficient evidence from which a jury could conclude, beyond a reasonable doubt, that Domina was the person who accompanied Purnell in carrying out these robberies.

## V.

### Other Contentions

#### A. *Subpoena to Newspaper*

■■■ Domina contends that it was error to quash and refuse to reissue a subpoena directed to the San Jose Mercury News, requesting production of all information it had received relevant to the case from its secret witness program. Domina contends that he had an interest in discovering whether any confidential informants were witnesses, whether any of the witnesses testified to obtain reward money, and whether the newspaper gave any information to the police.

The scope of discovery is within the trial court's discretion and we review only for an abuse of discretion. *United States v. Clegg,* 740 F.2d 16, 18 (9th Cir.1984). It was not an abuse of discretion to conclude that the need specified by the defendant did not justify the request. *See United States v. Cuthbertson,* 630 F.2d 139, 148 (3d Cir.1980), *cert. denied,* 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981).

#### B. *Denial of Mistrial Request*

■■■ Domina contends the district court erred in denying a mistrial because of a response by Purnell to a question by defense counsel in which he stated, "[W]e had talked in the past about his robberies which led to this...." The Government objected and the district judge sustained the objection, noting that he had admonished the jury not to consider prior robberies. Any prejudice to Domina was minimal in light of the brief reference and was, in any event, neutralized by the curative instruction. It was not an abuse of discretion to deny the mistrial. *See United States v. Kahan & Lessin Co.,* 695 F.2d 1122, 1124–25 (9th Cir.1982).

#### C. *Denial of Speedy Trial Motion*

■■■ Domina's argument that he was denied a speedy trial also lacks merit. The Speedy Trial Act requires that trial begin within seventy days of the filing of the indictment. 18 U.S.C. § 3161(c)(1). The Act, however, excludes from the seventy-day period a delay due to any pretrial motion, from the time of the filing of the motion to its prompt disposition. It also excludes delay due to a continuance that the defendant requests, when the court finds that the interest of justice outweighs

the public's and the defendant's interests in a speedy trial. *Id.* §§ 3161(h)(1)(F), (h)(8)(A).

Domina was indicted on July 20, 1983, and his trial began on December 13, 1983, 146 days after the indictment. The district court properly excluded the time from August 2 to September 2, 1983, because the Government's motion for a continuance was pending at that time. The court also properly excluded the period from September 2 to October 31, 1983, which period of delay resulted from Domina's own motion for a continuance. Domina challenges neither of these exclusions on appeal.

Domina conceded in the trial court that the time from September 2 to October 31 was excludable. He suggested that the period from August 2 to September 2 was not entirely excludable. He has not renewed this argument on appeal. The plain language of 18 U.S.C. § 3161(h)(1)(F) makes that period excludable.

Domina argues that the district court erred by excluding time after October 28, the date the Government moved on for a continuance based on Purnell's unavailability. In fact, however, the court excluded time because of the Government's August 2 motion and Domina's September 2 motion. With these two exclusions (31 days plus 59 days), the time between the filing of the indictment and the beginning of his trial was only fifty-six days, well within the seventy-day limit.

### D. *Denial of Motion for Continuance*

 Domina complains of a failure to grant a continuance to afford time to produce witnesses. "The decision to grant or deny a continuance lies within the sound discretion of the trial judge, and will only be overturned upon a showing of clear abuse." *United States v. Clevenger,* 733 F.2d 1356, 1359 (9th Cir.1984). When the accused requests a continuance to obtain witnesses, he must show, *inter alia,* what their testimony will be, the relevance of that testimony, and that he can probably obtain the witness if the continuance is granted. *United States v. Sterling,* 742

F.2d 521, 527 (9th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 2322, 85 L.Ed.2d 840 (1984).

Domina failed to show the requisite probability of obtaining the witness if a continuance were granted. In fact, his counsel stated he "can't indicate when we'd be able to serve" the witness. Domina declined the district court's invitation to make an *in camera* showing of the critical nature of the witness's testimony. The district court, therefore, acted well within its discretion by denying the motion for a continuance.

### E. *Failure to Give Addict Instruction*

 Domina complains of the district court's failure to instruct the jury that Purnell was a narcotics addict and of its instruction to disregard the disposition of the case against Purnell.

Because the district court properly excluded evidence of Purnell's narcotics addiction, nothing in the record supported an addict instruction. *See United States v. Candelaria,* 704 F.2d 1129, 1132 (9th Cir. 1983).

The district court also properly instructed the jury not to speculate on the reasons that the case had been disposed of as to Purnell. This instruction did not foreclose the jury's consideration of Purnell's possible motives for testifying. Indeed, the court permitted vigorous cross-examination and argument on the nature and effect of Purnell's plea bargain.

The district court's judgment is AFFIRMED.

SCHROEDER, Circuit Judge, dissenting.

This is a case in which identification testimony was important. The government called three identification witnesses. All were asked to identify the defendant in the suggestive surroundings of the courtroom without any safeguards such as a pretrial or in-court line up. This circumstance alone is sufficient to call into question the fairness of the trial. *See, e.g., United States v. Williams,* 436 F.2d 1166, 1168 (9th Cir.1970), *cert. denied,* 402 U.S. 912, 91 S.Ct. 1392, 28 L.Ed.2d 654 (1971). But

with two of the witnesses there were additional and much more serious problems.

One of the witnesses was asked to identify the defendant after he had donned the mask worn by the robber. Another was asked to identify the defendant's voice after he spoke the very words spoken by the robber. It is difficult to imagine any more corruptively suggestive procedures, short of transporting the jury to the bank and asking the defendant to reenact the crime.

I dissent from the majority opinion because I believe that these procedures deprived the appellant of a fair trial. The Supreme Court has enunciated a test to determine the permissibility of out-of-court suggestive identification procedures. *See Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). This court today does not apply this test to in-court suggestive identification procedures that are at least as prejudicial to the defendant's rights. In so doing, this court conflicts with the Eleventh Circuit, which applies the Supreme Court's test to both in-court and out-of-court suggestive identification procedures. *See Code v. Montgomery*, 725 F.2d 1316, 1319–20 (11th Cir.1984) (per curiam).

Had the majority applied the appropriate test as set out in *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), it too would have reached the conclusion that appellant was denied a fair trial. The test which the Supreme Court laid out is the following:

> [R]eliability is the linchpin in determining the admissibility of identification testimony for both pre- and post-*Stovall* confrontations. The factors to be considered .... include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

*Manson*, 432 U.S. at 114, 97 S.Ct. at 2253 (citations omitted).

The corrupting effect of the identifications in this case is obvious. The reliability of these identifications is virtually nonexistent. There were no pretrial identification procedures to establish the reliability of any of the in-court identifications. The witnesses did not have a good opportunity to observe the masked robber at the time of the crime. There was no certainty in their identifications.

Witness Newton testified that the robber *ran* into the bank, then immediately ordered her to get under a desk from which she could not see the robbery, and, finally after committing the robbery, *ran* out of the bank. Even after the defendant donned the robber's mask in open court, Newton was able to say only that the defendant had the same general appearance as the robber. She had earlier failed to tell the police about any distinctive features of the robber's face. This throws further doubt on the reliability of her testimony that she believed the masked Domina was the robber because they both had long necks and pronounced chins.

Witness Dowdy was asked to make an in-court voice identification. She testified that she heard the robber's voice for the ten minutes he was in the bank. She had no opportunity to hear the voice in the intervening five months before trial. Even after hearing the defendant say the same words as the robber had spoken, the witness was able to state only that the defendant's voice was "very similar to the robber's." As the majority's own opinion acknowledges, "neither witness identified Domina as the robber, only that his voice and general appearance were similar."

The procedures at trial did not produce reliable or certain identifications. They did unfairly present the defendant to the witnesses and the jury in the guise of a criminal.

In *United States v. Brown*, 644 F.2d 101 (2d Cir.), *cert. denied*, 454 U.S. 881, 102 S.Ct. 369, 70 L.Ed.2d 195 (1981), Judge Oakes dissented from the decision uphold-

ing a voice identification procedure in which the defendant was required to utter the robber's words in open court. In that case there was only one suggestive identification, and that alone prompted Judge Oakes to state:

> It is hard for me to conceive of a more prejudicial method of establishing a voice identification. Only if the jury had gone down to the bank and watched the defendant put on a ski mask, wave a toy gun, and shout "Give me your money or I'm going to blow you up," could Brown have been worse off. I know of no case—certainly neither the Government in its brief nor the majority in its opinion has found one—which justifies the use of an in-court identification procedure as suggestive and prejudicial as the one used here.

*U.S. v. Brown,* 644 F.2d at 107 (Oakes, J., dissenting).

This case presents the situation which Judge Oakes could not even imagine. If we must accept the majority decision of the Second Circuit in *Brown,* despite the powerful arguments of Judge Oakes, then surely it should be regarded as the outer limit of what our system should tolerate. This case goes beyond it. I therefore respectfully dissent.