849 F.2d 610
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Christopher Dean GILLMORE, Defendant-Appellant.
 No. 87-1941.
 United States Court of Appeals, Sixth Circuit.
 June 10, 1988.
 
 E.D.Mich.
 AFFIRMED.
 On Appeal from the United States District Court for the Eastern District of Michigan.
 Before KEITH and WELLFORD, Circuit Judges and EDWARDS, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 Appellant, Christopher Dean Gillmore, appeals his conviction, after jury trial, on two counts of conspiracy to possess with intent to distribute, and distribution of, cocaine; five counts of possession, with intent to distribute, cocaine; and one count of distribution of cocaine. For the following reasons, we AFFIRM.
 
 I.
 
 2
 The evidence adduced at trial revealed the existence of an enterprise engaged in the transportation of cocaine from Florida for distribution in Michigan, whose members included Gillmore, Michael Ivey, Fred Kregar and Hugo DeLotto. In the beginning, DeLotto and Ivey delivered cocaine to Kreger in Flint, Michigan. Eventually, however, after informing them that Kreger had been acting as a middleman, Gillmore began to receive deliveries directly from DeLotto.
 
 
 3
 In October of 1986, the conspiracy was penetrated when Ivey and DeLotto were apprehended with cocaine in their possession. Both agreed to wear a "wire" and to engage in conversation with Gillmore. On two occasions, Gillmore was taped in conversations while discussing cocaine transaction. These conversations were offered as evidence against Gillmore at trial.
 
 
 4
 As part of their case, the government offered evidence that (a) Gillmore informed Ivey that he owned houses and automobiles in the names of other persons; (b) Gillmore drove from the location where the taped conversations took place in a chrome-plated Cadillac; (c) DeLotto made numerous trips during the relevant period to Flint, the home of Gillmore; (d) DeLotto carried Gillmore and Kregar's telephone numbers in his address book; (e) Gillmore had been seen with, in addition to the chrome-plated Cadillac, a Corvette, a Lincoln, a van a Ford truck, and a Monte Carlo SS; (f) Flint City water and sewer records reflect service applications for seven Flint area homes in the names of Gillmore and his father and wife, William Gillmore and Shirley Gillmore; and (g) numerous telephonic contacts had taken place between Ivey and both Gillmore and his father. In addition, the government offered testimony from six witnesses who said that they had either purchased cocaine from or sold cocaine to Gillmore: Ivey, DeLotto, Allen Guest, Rhonda Guest, Robert Jones and Kenneth Wright.
 
 
 5
 Two evidentiary rulings by the district court are central to this appeal. In the first, the government sought to introduce evidence that the Internal Revenue Service had no record that Gillmore had filed any tax returns for 1985 and 1986. Upon an objection from counsel for Gillmore, the following colloquy took place:
 
 
 6
 * * *
 
 
 7
 * * *
 
 
 8
 MR. AMBERG: My basis, your Honor, that first of all, it's not relevant to the crime charged. Second of all, its 404B type evidence and I don't believe that it's germaine to the issue of fact given the fact that it is proof of another crime. Albeit a misdemeanor to file a return versus a felony to file a false return.
 
 
 9
 THE COURT: I don't quite understand. You're telling--yeah, I know but there are all kinds of proofs of other crime comes in under conspiracy all kinds of conspiracies. Wait a minute, this is his objection.
 
 
 10
 MR. AMBERG: This proof is not germaine. It doesn't show motive, it doesn't show--and it doesn't show preparation, doesn't show plan, knowledge, doesn't show absence of mistake. And my understanding of the rule is it's got to be more--
 
 
 11
 THE COURT: Doesn't it show that he has large sources of, large sources of money without any income, and isn't that consistent with the conspiracy?
 
 
 12
 MR. AMBERG: I don't think at this point in time the Government has shown that he has a large amount of money for profits.
 
 
 13
 THE COURT: I don't know about profits; he's got $32,000 on the floor or may have $38,000.
 
 
 14
 MR. AMBERG: The Court is well aware of--
 
 
 15
 THE COURT: I don't know, but now what you're saying is that--no, I can't go your route; overruled.
 
 
 16
 * * *
 
 
 17
 * * *
 
 
 18
 Amended Transcript at 10-11. During its closing argument, the government told the jury, referring to the IRS records, that "[t]he limited purpose that you consider that for is the fact that there is no other source of income." Transcript, Vol. XI, pp. 14-15. Moreover, the trial court instructed the jury that those records were to be used only for the issue of Gillmore's sources of income, and not for any other purpose. Transcript, Vol. VI, p. 55.
 
 
 19
 The second evidentiary issue arose when the government sought to introduce evidence of an incident which allegedly occurred between Gillmore and Ken Wright. At trial, Carol Wright, Ken Wright's mother, testified that a man had come to her house and had threatened to break her son's legs. When Carol Wright was asked if she could identify the man she saw from among those persons in the courtroom, over objection, she indicated that Gillmore resembled him:
 
 
 20
 * * *
 
 
 21
 * * *
 
 
 22
 Q. Is he in the courtroom today?
 
 
 23
 A. I'm not sure.
 
 
 24
 Q. Do you want to take a look around?
 
 
 25
 A. I'm really not sure.
 
 
 26
 * * *
 
 
 27
 * * *
 
 
 28
 Q. Ma'am, as to that original contact of the date when someone came over and said who they were, were you able to see the person who said they were Chris Gillmore very well?
 
 
 29
 A. You mean when he came alone?
 
 
 30
 Q. Yeah--pardon me?
 
 
 31
 A. You mean when he came alone?
 
 
 32
 Q. Yes?
 
 
 33
 A. Yes.
 
 
 34
 Q. Can you take a close look all over the courtroom and see ask--indicate whether or not that person is here?
 
 
 35
 MR. AMBERG: Objection. That question has been asked and answered previously and the witness has already given her response.
 
 
 36
 THE COURT: Overruled.
 
 
 37
 (By Mr. Jones, continuing:)
 
 
 38
 A. I'm not sure.
 
 
 39
 Q. Is there someone who resembles him?
 
 
 40
 A. Pardon?
 
 
 41
 Q. Is there someone here who resembles the person that came by that day?
 
 
 42
 A. Maybe if they had longer hair, Chris right there, (indicating).
 
 
 43
 Q. Okay, who is the person that resembles him the most in the courtroom? Would you point, please.
 
 
 44
 A. Chris.
 
 
 45
 Q. Is his hair different than it was at that time?
 
 
 46
 A. Yes.
 
 
 47
 MR. JONES: May the record reflect that she has pointed at Defendant Chris Gillmore?
 
 
 48
 THE COURT: Yes.
 
 
 49
 * * *
 
 
 50
 * * *
 
 
 51
 MR. AMBERG: Your Honor, I object to what the prosecution has done with reference to identifying the Defendant. It is obvious the City Counsel table are two attorney in jacket and ties or ask questions and making comments to the Court.
 
 
 52
 There's also an older gentleman and a young man who is my client. There are no other young men that I can perceive of sitting in the court other than a couple in the jury box. It is obvious that the Prosecutor's questioning of this witness was done solely to elicit some type of identification of the Defendant.
 
 
 53
 THE COURT: Sure. It was obviously done to get identification of the Defendant.
 
 
 54
 MR. AMBERG: She has already indicated she could not identify the Defendant.
 
 
 55
 THE COURT: That's right. But, she also said that they resembled them and it looks like them.
 
 MR. AMBERG: (Inaudible.)
 
 56
 THE COURT: Objection is denied as is the motion [for mistrial].
 
 
 57
 (By Mr. Jones, continuing:)
 
 
 58
 Q. Mrs. Wright, now in terms of the person you said resembles him, is that the one were're talking about that came over that one day two times?
 
 
 59
 A. Yes.
 
 
 60
 * * *
 
 
 61
 * * *
 
 
 62
 Transcript, pp. 4, 11-13.
 
 II.
 A.
 
 63
 On appeal, Gillmore argues that the IRS records were not relevant, Fed.R.Evid. 401, 402; and that the evidence was improper proof of another crime. Fed.R.Evid. 404(b). Both contentions are without merit.
 
 
 64
 First, the trial court is given great discretion in determining the relevance of evidence. Humling v. United States, 418 U.S. 87, 124-125 (1974); United States v. Phillips, 575 F.2d 97, 100 (6th Cir.1978). In the matter sub judice, we cannot say that there was an abuse of that discretion. The evidence adduced from government witnesses indicated that Gillmore was in possession of numerous automobiles and owned several homes; in attempting to prove that these possessions were the fruit of Gillmore's narcotics activity, the government was entitled to demonstrate that Gillmore had no legitimate source of income which would account for the many cars and homes.
 
 
 65
 As for Rule 404(b), that rule allows the introduction of evidence of other crimes if it is offered for some purpose other than to show action in conformity with bad character on the part of the accused. Here, the evidence clearly was offered for the limited purpose of showing that Gillmore had no other source of income. Indeed, both the government and the jury emphasized the limited purpose of this evidence. Thus, no violation of Rule 404(b) occurred.
 
 
 66
 Even if we were to decide that the district court erred, we would conclude that any such error was harmless. Chapman v. California, 386 U.S. 18, 22 (1967). As outlined in Section I, supra, the evidence of Gillmore's guilt was overwhelming. We are not persuaded that the introduction of evidence that Gillmore twice failed to pay taxes had any impact in the jury's decision, given the strong indications of Gillmore's culpability in cocaine trafficking.
 
 B.
 
 67
 As in the case of relevance determinations, both the denial of a motion for mistrial and the control of in-court identification procedures are matters within the discretion of the trial court. Hamm v. Jabe, 706 F.2d 765, 767 (6th Cir.1983) (mistrial); United States v. Domina, 784 F.2d 1361, 1369 (9th Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 893 (1987) (in-court identification procedures). Under the circumstances, the trial court did not abuse its discretion in allowing Carol Wright to testify that Gillmore resembled the person she had seen at her home. The fact that her identification was equivocal does not change this result; the jury was free to accept or reject her testimony as part of its evaluation of credibility.
 
 
 68
 Moreover, contrary to Gillmore's assertion, where the question of guilt does not hang entirely on the reliability or accuracy of the in-court identification, there is no entitlement to an in-court line-up or other methods of lessening the suggestiveness of an in-court identification. Domina, 784 F.2d at 1369. Here, certainly, there was more than ample evidence outside the courtroom identification to implicate Gillmore.
 
 
 69
 Further, as in the admission of the IRS records, even if there was error in allowing the courtroom identification, this was clearly harmless. Chapman, 306 U.S. at 22.
 
 III.
 
 70
 Accordingly, for the foregoing reasons, the judgment is hereby AFFIRMED.