**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Richard OLVERA, Defendant–Appellant.**

No. 93–50234.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 8, 1994.

Decided July 27, 1994.

Robert L. Swain, Swain & Vance, San Diego, CA, for defendant-appellant.

Alana M. Wong, Asst. U.S. Atty., San Diego, CA, for plaintiff-appellee.

Before: PREGERSON, O'SCANNLAIN, and FERNANDEZ, Circuit Judges.

Opinion by Judge O'SCANNLAIN; Dissent by Judge FERNANDEZ.

O'SCANNLAIN, Circuit Judge:

May a defendant be compelled at trial to recite statements made during a crime?

**I**

On July 9, 1991, a man wearing a cap and dark sunglasses entered the Security Pacific Bank in San Diego, California and cut in line to approach bank teller Rosa Ybarra. The man told Ybarra, "[w]hy don't you give me your money?" After Ybarra said "[h]uh?," the man said, "[g]ive me all of your money." He repeated his command in Spanish, instructing Ybarra, "[d]ame tu dinero." As Ybarra began giving him the money in her cash drawer, he told her to "[h]urry up." The man then took the money and fled the bank.

Ybarra and another teller later told the Federal Bureau of Investigation ("FBI") that

the bank robber was a 5'5" tall Hispanic male who had a mustache and some missing teeth. After viewing photo line-ups, Ybarra identified Richard Olvera as the robber. The other teller also picked Olvera and two other individuals out of the line-up. The FBI subsequently arranged for Olvera to appear in a live line-up, where Ybarra and the second teller identified Olvera as the robber.

The government charged Olvera with one count of unarmed bank robbery in violation of 18 U.S.C. § 2113(a). At trial, Ybarra told the jury what the robber had said to her. She testified that the bank robber's speech was slurred and that he had spoken with a lisp, which she said could have been caused by his "Fu Manchu" moustache or missing tooth.

During its examination of Ybarra, the prosecution called for Olvera to stand in front of the jury to demonstrate his missing tooth and to speak the words uttered by the robber. Over an objection, Olvera was required to say, "[w]hy don't you give me all of your money? Give me all of your money. Dame tu dinero." The prosecution then continued with its examination of Ybarra, never asking her if Olvera's voice was similar to that of the robber.

The jury ultimately rendered a verdict of guilty. The district court entered judgment, and this appeal ensued.

## II

Olvera asserts that the trial court violated his Fifth Amendment right to due process by requiring him to speak the words of the robber in front of the jury. Speaking these words compromised the presumption of his innocence, Olvera argues.

■ "The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice" *Estelle v. Williams,* 425 U.S. 501, 503, 96 S.Ct. 1691, 1692, 48 L.Ed.2d 126 (1976). It thus is a requirement of due process. *Bentley v. Crist,* 469 F.2d 854, 855 n. 2 (9th Cir.1972). "To implement the presumption, courts must be alert to factors that may undermine the

fairness of the fact-finding process." *Williams,* 425 U.S. at 503, 96 S.Ct. at 1693.

Some courtroom practices are so inimical to the presumption of innocence that they violate defendants' due process rights. Compelling a defendant to appear at trial in prison garb is impermissible because the constant reminder of the defendant's incarcerated status may affect jurors' perception of him or her as a wrongdoer. *Id.* at 504–05, 96 S.Ct. at 1693; *Felts v. Estelle,* 875 F.2d 785, 786 (9th Cir.1989); *Bentley,* 469 F.2d at 856. Unnecessary shackling or gagging of a defendant during trial is improper for the same reason. *Illinois v. Allen,* 397 U.S. 337, 345, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970); *Jones v. Meyer,* 899 F.2d 883, 884 (9th Cir.) ("Generally, a criminal defendant has a constitutional right to appear before a jury free of shackles."), *cert. denied,* 498 U.S. 832, 111 S.Ct. 95, 112 L.Ed.2d 67 (1990). The deployment of excessive numbers of security personnel in a courtroom also can undermine the presumption of innocence. *Holbrook v. Flynn,* 475 U.S. 560, 569, 106 S.Ct. 1340, 1346, 89 L.Ed.2d 525 (1986) ("To be sure, it is possible that the sight of a security force within the courtroom might under certain conditions 'create the impression in the minds of the jury that the defendant is dangerous or untrustworthy.'"). *See also Norris v. Risley,* 918 F.2d 828 (9th Cir.1990) (presumption of innocence impaired where numerous women wearing "Women Against Rape" buttons attended trial of defendant charged with sexual assault).

We must determine whether, like these practices, requiring a defendant to speak the words uttered during a robbery is unduly suggestive of guilt. In so doing, we are mindful that

> the actual impact of a particular practice on the judgment of jurors cannot always be fully determined. But ... the probability of deleterious effects on fundamental rights calls for close judicial scrutiny. Courts must do the best they can to evaluate the likely effects of a particular procedure, based on reason, principle, and common human experience.

*Williams,* 425 U.S. at 504, 96 S.Ct. at 1693 (citations omitted); *Norris,* 918 F.2d at 834.

■ Compelling a defendant to utter a criminal's words clearly has the potential to violate due process.[1] It would be inconsistent with the presumption of innocence, for instance, to require a defendant to "put on a ski mask, wave a toy gun, and shout '[g]ive me your money or I'm going to blow you up.'" *United States v. Brown,* 644 F.2d 101, 107 (2d Cir.), *cert. denied,* 454 U.S. 881, 102 S.Ct. 369, 70 L.Ed.2d 195 (1981) (Oakes, J., dissenting); *United States v. Domina,* 784 F.2d 1361, 1374 (9th Cir.1986), *cert. denied,* 479 U.S. 1038, 107 S.Ct. 893, 93 L.Ed.2d 845 (1987) (Schroeder, J., dissenting). Common sense explains this conclusion. Much like the wearing of prison clothes, the uttering of a criminal's statements isolates the defendant from all others in a courtroom and inevitably associates him or her with the charged conduct, thus tending to "brand [him or her in the jurors'] eyes with an unmistakable mark of guilt." *Holbrook,* 475 U.S. at 571, 106 S.Ct. at 1347 (internal quotation omitted). The potential for influencing jurors' judgment is particularly acute when a defendant invokes his or her Fifth Amendment right not to testify. In such a situation, the only statements by the defendant that the jury ever will hear are those in which he or she mimics the criminal. These statements thus are likely to remain prominent in jurors' memories and to dominate their perception of the defendant. *Cf. Williams,* 425 U.S. at 504–05, 96 S.Ct. at 1693 ("the constant reminder of the accused's position implicit in . . . distinctive, identifiable attire may affect a juror's judgment").[2]

However, a defendant's utterance of a criminal's statement may not have an undue influence on the jury where the jury has a clear understanding that the utterance is necessary for identification of the defendant by a witness. In *Domina,* a witness testified that she could identify the person who robbed her only by his voice. The court responded by requiring the defendant to say, "[l]adies, this is a holdup. Put the money in a bag." The witness then stated, "[y]es that is the voice I heard." *Id.* at 1371. The defendant appealed his subsequent conviction, arguing that his compelled statement was unduly prejudicial because it created an aura of guilt. We rejected this claim without explanation, concluding that, although "it would have been far better procedure to have had [the defendant] repeat neutral words," the statement did not constitute "reversible error." *Id.* at 1371–72.

*Domina* indicates that requiring a defendant to speak a criminal's words does not convey a message of guilt where the prosecution makes clear that the procedure is necessary for witness identification and the prosecution carries out the procedure in a manner consistent with this objective. In such circumstances, the jury is aware that the procedure is not intended to communicate a message regarding the defendant's culpability, *Norris,* 918 F.2d at 831–32 ("Women Against Rape" buttons signaled community's belief in defendant's guilt to jury), and is more likely to guard against impermissible inferences from the defendant's statement. *Cf. Holbrook,* 475 U.S. at 569, 106 S.Ct. at 1346 ("The chief feature that distinguishes the use of security officers from courtroom practices we might find inherently prejudicial is the

---

**1.** The Supreme Court's decision in *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), does not hold otherwise. In *Wade,* the Court held that requiring a defendant to utter the words of a criminal did not violate a defendant's right against self-incrimination. *Id.* at 222–23, 87 S.Ct. at 1929–30. *Wade* did not address the distinct claim that such a compelled utterance violates due process by compromising the presumption of innocence.

**2.** The dissent disagrees with this conclusion, suggesting it is "a rather condescending view of jurors." Dissenting Opinion at 1199. Such argument proves too much. One could just as easily assert that jurors are not influenced when a defendant (involuntarily) wears prison garb at

trial. After all, shouldn't it be "obvious" to a jury that a defendant is merely wearing the state's clothes and that these clothes do not reflect the defendant's culpability?

The dissent also emphasizes that the defense, rather than the government, made use of Olvera's compelled statement by arguing in its closing statement that Olvera had not spoken with a lisp. Dissenting Opinion at 1199. This view ignores the fact that Olvera had objected to giving the compelled statement in the first place. That his attorney later attempted to minimize its negative impact, or even sought to use it to Olvera's advantage, does not suggest that he believed that introduction of the statement was in Olvera's best interest.

wider range of inferences that a juror might draw from the officers' presence.").

■ These circumstances were not present in the instant case. First, Ybarra never testified that she could identify Olvera *only* by his voice; in fact, she ultimately identified Olvera visually at trial. The jury was presented with no explanation why it was essential to require Olvera to repeat the bank robber's words. Without such an understanding, the jury was more likely to infer from Olvera's utterance of these words a connection between him and the charged conduct.

Second, the prosecutor did not carry out Olvera's voice identification in a manner calculated to minimize potential negative inferences. The prosecutor never asked Ybarra—or any other witness—whether she recognized Olvera's voice. Instead, he merely excused Olvera and proceeded to question Ybarra about the robber's physical characteristics. From the jury's perspective, then, compelling Olvera to speak could have appeared to be no more than a simple demonstration of Olvera's actual commission of the robbery.

Finally, Olvera invoked his Fifth Amendment right not to testify at trial. His utterance of the robber's words thus was likely to stand out in the jury's memory and to affect its ultimate assessment of his culpability.

We conclude that Olvera's compelled utterance posed an unacceptably high risk of influencing the jury's judgment in a manner that undermined the presumption of innocence. Consequently, Olvera did not receive a fair trial. *See Norris*, 918 F.2d at 834. We reverse his conviction and direct the district court to grant him a new trial.[3]

**REVERSED.**

FERNANDEZ, Circuit Judge, dissenting:

I do not agree that Olvera's constitutional rights were violated when he was required to speak the words that the robber had used.

It is plain that having him parrot words after the witness did not implicate his privilege against self-incrimination. Simply put, there was nothing testimonial about that. *See, e.g., Pennsylvania v. Muniz*, 496 U.S. 582, 590–600, 110 S.Ct. 2638, 2644–49, 110 L.Ed.2d 528 (1990); *United States v. Dionisio*, 410 U.S. 1, 5–7, 93 S.Ct. 764, 767–68, 35 L.Ed.2d 67 (1973); *United States v. Wade*, 388 U.S. 218, 221–23, 87 S.Ct. 1926, 1929–30, 18 L.Ed.2d 1149 (1967). Nor does the fact that he was asked to repeat some words in Spanish change the analysis or the result. That did not disclose the contents of his mind. *See Doe v. United States*, 487 U.S. 201, 210 & n. 9, 108 S.Ct. 2341, 2347 & n. 9, 101 L.Ed.2d 184 (1988). It was no more redolent of testimony about mental processes than is speaking in English. It only demonstrated the sound of his voice. If the words incriminated him, that was because of the way they sounded, not because of their content. Indeed, contrary to his argument, his ability to repeat Spanish words does not even prove that he can speak Spanish.

Olvera's claim that forcing him to speak the words of the robber violated his fundamental right to due process is no stronger. He asserts that parroting the words after the witness somehow cloaked him with an aura of guilt. I do not think so. We rejected that argument in *United States v. Domina*, 784 F.2d 1361, 1371–72 (9th Cir.1986), *cert. denied*, 479 U.S. 1038, 107 S.Ct. 893, 93 L.Ed.2d 845 (1987). So have many other courts. See *Burnett v. Collins*, 982 F.2d 922, 925–28 (5th Cir.1993), which collects some of the cases to that effect. It is true that in *Domina*, we, in a dictum, said that "it would have been a far better procedure to have had Domina repeat neutral words." 784 F.2d at 1371–72. We are asked to place great weight on that statement. Nevertheless, we did uphold the conviction in that case. Moreover, just why it would have been far better is far from clear.

Consider. Most people do not speak in a monotone. Their intonation varies from word to word and from phrase to phrase. If

---

**3.** Olvera also raises other issues on appeal. We decline to reach those issues because of our decision to reverse on due process grounds.

you truly wished to identify a sound you once heard, you would not have different sounds played. But what are words if not collections of sounds? *Cf. Dionisio,* 410 U.S. at 3, 93 S.Ct. at 766 (in order to compare defendants' voices with intercepted conversations, defendants were ordered to read from transcripts of those conversations.) When a defendant is asked to merely repeat words being stated by a witness in open court, it must be obvious to a jury that he is doing just that—repeating the sounds someone else is making. It requires a rather condescending view of jurors to make one think that they become confused and decide that the mere repetition of the words makes the defendant the robber. Moreover, in this case the court instructed the jury that Olvera was not testifying when he spoke the words but was simply demonstrating the sound of his voice.

Nor do I think that having Olvera speak the same words is at all like having him reenact the crime itself, which, it is said, would somehow confuse his persona with that of the robber. Not only is the sound of a few words palpably different from a reenactment, but also if a defendant were merely asked to repeat gestures made by the witness, the reenacting problem would be entirely removed. Again, it would be a fairly silly juror who would think that a defendant was guilty because he mimicked what another person in the courtroom was doing. I think that jurors are made of stronger stuff.

Olvera makes much of the fact that while the government sought to put in voice evidence in order to help the witness identify him, it never once asked the witness whether his voice at trial *did* help her. Quite so. If one wonders why not, the answer is close at hand. The witness said that the robber had a lisp, or unusual slur, when he spoke. The prosecutor took a chance; lo and behold, Olvera's voice did not fit that description. Whatever the government's plan might have been, like "the best laid schemes o' mice an' men," it went "agley." [1] Not surprisingly, there was no follow-up by the government.

But that demonstrates another good, relevant reason for having a defendant speak. Tonal characteristics might well demonstrate

that he has (or has not) the speech characteristics of the robber. Olvera's alert counsel recognized that. So who in the midst of this supposed assault on fairness and due process ultimately made use of Olvera's speaking? Olvera did. It was his counsel who told the jury that the wrong person had been accused. Counsel listed factors which tended to show that. "And," he said, "of course, the strongest factor shows that Mr. Olvera is not the person, because the teller was certain that the person that came in had a lisp. You heard Mr. Olvera speak. He came right up here, stood right about here, said the words the teller said were used at the time, and there's no lisp. The FBI agent, Special Agent Gonzalez confirmed that. He spoke to Mr. Olvera when he was serving him the subpoena for the line-up. He detected no lisp. And then he also was present at the live line-up and he says that nobody spoke any different than anyone else."

If nothing else demonstrated the error in Olvera's present position, that argument to the jury surely would. Olvera had a fair trial; he was not denied due process.

Thus, I respectfully dissent.